**Eloise BEARD, as Administratrix of the Estate of Jeff Beard, Deceased, Plaintiff-Appellant,**

v.

**Roy Martin MITCHELL, Defendant-Appellee.**

No. 78–2592.

United States Court of Appeals, Seventh Circuit.

Argued April 27, 1979.

Decided Aug. 7, 1979.

Rehearing and Rehearing In Banc Denied Oct. 19, 1979.

488

Harold C. Hirshman, Chicago, Ill., for plaintiff-appellant.

Thomas P. Sullivan, U. S. Atty., William A. Barnett, Jr., Asst. U. S. Atty., Chicago, Ill., for defendant-appellee.

Before FAIRCHILD, Chief Judge, MOORE, Senior Circuit Judge,* and SPRECHER, Circuit Judge.

SPRECHER, Circuit Judge.

Plaintiff, Eloise Beard,[1] appeals from a jury verdict finding the defendant, Roy Martin Mitchell, not guilty of depriving her deceased brother of rights secured by the United States Constitution. Plaintiff seeks a new trial on the grounds that the trial

---

* The Honorable Leonard P. Moore, Senior Circuit Judge of the United States Court of Appeals for the Second Circuit, is sitting by designation.

1. Plaintiff is administratrix of Jeff Beard's estate. Plaintiff's right to maintain the suit was established in a prior decision of this court. *Beard v. Robinson,* 563 F.2d 331 (7th Cir. 1977), *cert. denied,* 438 U.S. 907, 98 S.Ct. 3125, 57 L.Ed.2d 1149 (1978).

judge improperly instructed the jury and committed other prejudicial errors in the conduct of the trial. We affirm.

## I

On May 17, 1972, Jeff Beard was abducted and brutally murdered by Stanley Robinson, a Chicago police officer. An F.B.I. informant, William O'Neal accompanied Robinson on the night of the murder. Robinson was convicted of the crime in 1973.[2] In 1975 plaintiff brought this suit against Roy Martin Mitchell, an F.B.I. agent who participated in the investigation of Robinson's activities.[3] Plaintiff alleges that Mitchell's reckless conduct of the Robinson investigation resulted in the deprivation of Jeff Beard's constitutional rights, giving rise to a *Bivens* action for damages. The plaintiff contends that liability could be premised on Mitchell's reckless training and use of an informant, O'Neal, whose conduct allegedly caused Beard's death. Further plaintiff maintains that liability could be premised on Mitchell's failure to arrest Robinson prior to the murder or to take other preventive action.

A thorough review of the facts surrounding the investigation is necessary to demonstrate what information Mitchell had and how he acted in response to that information. Much of the evidence adduced at trial was undisputed. The plaintiff introduced testimony to establish that Mitchell and O'Neal had a long-standing relationship. In 1968 Mitchell recruited O'Neal, who was under investigation for car theft, to be an informant for the F.B.I. At Mitchell's request, O'Neal joined the Black Panther Party (B.P.P.) in order to monitor its activities for the F.B.I. O'Neal continued this assignment until February of 1972, contacting

Mitchell almost daily for much of the period. The plaintiff established that in his role as informant O'Neal participated in criminal activities with other B.P.P. members and that Mitchell had knowledge of these activities.[4] Mitchell also introduced evidence establishing that O'Neal was successful in preventing crimes on a number of occasions. O'Neal ceased activity as a B.P.P. informant in early 1972.

In December of 1971 or January, 1972, Ira Lynn Roten, a special agent of the F.B.I. was assigned to investigate the disappearance of Richard Stean, whose father had received an extortion letter. The Chicago Police Department was concurrently investigating the murder of six black businessmen whose bodies were recovered from the Chicago Canal. After Stean's body was recovered from the same canal, Roten coordinated his investigation with the Chicago Police because of the possibility of a single conspiracy.[5]

Although Mitchell was then assigned to the Joliet office, Roten requested Mitchell to contact his Chicago sources in an effort to acquire information relating to the Stean investigation. Mitchell was not actually assigned to the investigation until much later. On May 16 or 17, Mitchell contacted O'Neal. Roten subsequently informed Mitchell that the Chicago Police theorized that the murders may have been committed by a former police officer since there had been no evidence of rough abductions.

On the afternoon of April 21 or 22, 1972, O'Neal received a telephone call from a relative, Theodore Holmes, requesting O'Neal to participate in a robbery planned by a police officer. O'Neal agreed, for the purpose of supplying information to Mitch-

**2.** The conviction was upheld by this court in *United States v. Robinson*, 503 F.2d 208 (7th Cir. 1974), cert. denied, 420 U.S. 949, 95 S.Ct. 1333, 43 L.Ed.2d 427 (1975).

**3.** The complaint also named Stanley Robinson, William O'Neal, an F.B.I. informant, and unnamed F.B.I. officials as defendants in the action. Robinson was dismissed by stipulation of the parties. The plaintiff's claims against O'Neal and unnamed F.B.I. agents are pending in a separate action in the district court.

Mitchell was tried as the sole defendant in this cause.

**4.** It was not established that O'Neal himself ever committed any criminal acts of violence against a person.

**5.** The F.B.I. jurisdiction over the investigation was premised on the use of extortion in the Stean case.

ell. The same evening O'Neal and Holmes met with Stanley Robinson to discuss the plans for a million dollar robbery. Robinson advised them that the robbery was to be financed with money obtained by robbing narcotics dealers.

The same evening Robinson recruited Holmes and O'Neal to assist him in the robbery of a drug dealer named "Stu." While waiting for Stu, Robinson spotted a man named Coffey, who worked for Stu. Robinson put Coffey in the back seat of the car with O'Neal and began questioning him about Stu. At Robinson's direction, O'Neal handcuffed Coffey and slapped him when he refused to give any information. While driving the car, Robinson handed O'Neal a plastic bag with a string and an ice pick and informed O'Neal to place the bag over Coffey's head and tie it. O'Neal stated that, when Coffey became frantic, O'Neal said "hey man, that man is dying," and removed the bag.[6] When Coffey still didn't talk, Robinson ordered him to put the bag on again. O'Neal started to do so, but Coffey began disclosing information. Coffey was later released.

O'Neal reported the incident to Mitchell shortly after it occurred. Mitchell, however, did not report the incident to the Chicago Police or to the U. S. Attorney at that time. Mitchell testified that he did not do so because he did not know the identity of the victim ("Coffey" was a nickname) and he had no corroboration of O'Neal's account. He also doubted whether the F.B.I. had jurisdiction over the case. Mitchell stated that he did tell O'Neal that O'Neal should not have struck Coffey but that Mitchell thought O'Neal might well have saved Coffey's life.

O'Neal's activities with Robinson continued. Shortly after the Coffey incident, on approximately April 24, Robinson enlisted Holmes and O'Neal to assist in performing a contract to murder Chuck McFerren, owner of the El Caballero lounge. Pancho Hall, the "contractor," wanted McFerren killed to prevent him from testifying in a state murder trial.

During the next two weeks, approximately April 24 through May 6, Robinson, O'Neal and Holmes waited for the opportunity to murder McFerren. A number of incidents occurred during those two weeks. At some point Robinson informed O'Neal that he had previously murdered three black Chicago businessmen for money. Other individuals became engaged with Robinson during this period. William Tolliver, another Chicago police officer and an associate of Robinson's, joined the hunt for McFerren. O'Neal introduced two other criminals that he had encountered in his B.P.P. activity to Robinson for assistance. O'Neal stated that this was done to bolster his own protection.

During the first week in May, while staking out the lounge, Tolliver and Robinson reported seeing McFerren drive by in a yellow Mercury Cougar. Tolliver and Robinson pursued the Cougar, leaving O'Neal to watch the lounge. The two returned and informed O'Neal that they had shot and killed McFerren in the Cougar. O'Neal advised them that he had just seen McFerren in the lounge. After the Cougar incident, but still during the first week in May, O'Neal, Tolliver and Robinson believed they saw McFerren in a blue Pontiac. Robinson told O'Neal that it was "his turn." O'Neal got out of Robinson's car and followed the Pontiac into an alley. He fired his gun but did so in a manner to avoid hitting anyone. Robinson later learned that no one was shot.

There is a dispute as to precisely how much Mitchell knew about the activities which transpired between April 24 and May 6. Mitchell did not notify McFerren during this period that his life was in danger. He maintained, however, that his only information on this before May 6, was that his name was "Chuck" and that Robinson intended to extort money from him. Mitchell did relay the information concerning the Coffey incident and that concerning "Chuck" to agent Roten, the agent assigned to the case, sometime before May 6. Mitch-

---

**6.** There is some dispute as to whether Robinson might have told O'Neal to remove the bag.

ell stated that he did not attempt to corroborate the information because he was not the case agent. Roten had informed him that he had unsuccessfully attempted to locate Stu and Coffey.

On May 6, O'Neal, Robinson and Tolliver followed McFerren's Cadillac onto an expressway at 5:00 a. m. Robinson identified the passenger as McFerren and positioned the car so that Tolliver could shoot. Using O'Neal's carbine, Tolliver shot and killed the passenger. The passenger was not McFerren, but an individual later identified as. Verdell Smith. Later that morning, Robinson, Tolliver and O'Neal took the carbine to O'Neal's father's house. O'Neal stated that he called Mitchell to inform him of the May 6 killing the same afternoon. Mitchell testified that he did receive a call from O'Neal on May 6 but that O'Neal only said "These [people] are killers" and hung up. Mitchell said O'Neal did not report the May 6 murder of Verdell Smith to Mitchell until May 8 or 9.

Shortly after receiving this information, Mitchell reported it to Roten. Mitchell also began attempts to corroborate O'Neal's account. On May 10, Mitchell went to the Chicago Police headquarters to check the arrest records for the names he had learned and to determine whether Verdell Smith's death had been reported. Mitchell informed Officer James Tobin as to the information he needed and requested his assistance.

Tobin called Mitchell a day or two later and advised him that Verdell Smith's murder had been reported but that the murderer had confessed and that the police had closed the case. Tobin agreed to meet Mitchell at his home on May 13 and bring a copy of the report. Before meeting with Tobin on May 13, Mitchell met O'Neal in order to pick up the gun used in the Smith murder. At the meeting with Tobin, Mitchell shared the information which he had relating to Robinson's activities. Although McFerren's chauffeur had confessed to the

murder of Smith, Mitchell told Tobin that he had doubts ·about the veracity of the confession. Tobin agreed to seek permission to work on the case in coordination with the F.B.I.

After the May 6 murder of Verdell Smith, O'Neal continued his association with Robinson. On approximately May 15, Robinson, O'Neal, and Bruce abducted Joe Rubio, a narcotics dealer. O'Neal was driving and Robinson cocked his gun, aiming it at Rubio and said that he was going to kill Rubio. Robinson told O'Neal to drive to the forest preserve. O'Neal testified that he told Robinson that Rubio could be financially important to them and that killing him would be senseless. Robinson agreed to let Rubio out of the car after he paid each of them $100. Afterwards Robinson told O'Neal that he was not to do that anymore and that in the future when he was told to do something, he had better do it.

On approximately May 14, Mitchell met with Roten to discuss the case and the information he received from Tobin. On May 15, Mitchell conducted an extensive briefing session with O'Neal wherein he learned the details of the events during the McFerren surveillance. Plaintiff contended that O'Neal's testimony established that he knew these details sooner, but he clearly knew them by the 15th. After the interview Mitchell forwarded the Smith weapon to Roten to be taken·to the crime laboratory. On May 16, Mitchell and Roten pursued some leads on locating "Stu."

On either May 16 or 17, Mitchell was officially assigned to assist Roten in the Robinson investigation. On May 17, Roten and Mitchell spent the entire day interviewing the individuals O'Neal had named. They interviewed McFerren and informed him that he was the intended victim in the Verdell Smith killing.[7] They also interviewed the chauffeur who had confessed to the killing, Anthony Brown, who admitted that his confession was false. The agents

---

7. Mitchell testified that he had made one prior unsuccessful attempt to inform McFerren that he was in danger.

were also able to determine the identity of "Stu" and "Coffey" and interviewed them as well. Mitchell did not arrive home until midnight on May 17.

On the afternoon of May 17, the date of Jeff Beard's murder, Robinson called O'Neal and told him that he would not be able to see O'Neal that evening because he had something else going. O'Neal protested that he did not wish to be left out. Robinson explained that it was only a small job and that he thought O'Neal had no interest in small jobs. O'Neal persuaded Robinson to include him.

O'Neal and Robinson set out at 6:00 that evening to perform a murder contract. Robinson only knew that the intended victim was a tall black man named Jeff with a high natural hair style. After searching unsuccessfully for some time, O'Neal told Robinson he should get better information. Robinson did so but was still unsuccessful at locating him after 2½ more hours of searching. O'Neal then told Robinson he was tired and wanted to go home. While driving O'Neal back to his car, Robinson fortuitously spotted Jeff Beard in a pool hall.

Robinson and O'Neal sat outside the pool hall for 45 minutes. During that time O'Neal went to a telephone and tried to call Mitchell at his home. Mitchell had not yet returned from conducting the corroborating interviews with Roten. O'Neal left no message other than his name. O'Neal returned to the car.

When Beard came out of the pool hall Robinson instructed O'Neal to drive into an alley. Robinson got out of the car and placed Beard under arrest and handcuffed him. Robinson and Beard got into the back seat. Robinson told O'Neal that they were taking Beard to the Indiana District which O'Neal understood as an instruction to drive south.

When O'Neal had reached the 75th Street exit of the Dan Ryan Expressway, Robinson told him to exit so that he could make a telephone call. Robinson was out of the car for three to five minutes. O'Neal did not inform Beard that Robinson intended to kill him, nor did he attempt to drive away. He testified that he did not do so because he feared Robinson would kill him. When Robinson returned he began driving and told Beard that he was not under arrest but that they wanted him to sell narcotics for them.

Robinson later pulled off on the shoulder of the road in Indiana. He stepped out of the car alone, and O'Neal slid into the driver's seat. O'Neal again did not attempt to drive away. Robinson returned and asked Beard to leave the car so they could talk. O'Neal remained in the car. When Beard got out and walked around to the back of the car, Robinson shot him, but did not fatally wound him. Beard dashed out in front of the traffic and ran across the interstate.

Robinson returned to the car and O'Neal said that Robinson had really "screwed up." Robinson told O'Neal to stay there. Robinson found Beard and brutally murdered him. Robinson then called to O'Neal, who went and helped throw Beard's body over a fence.

O'Neal called Mitchell at 3 or 4:00 a. m. that morning and reported what had occurred. Mitchell and Roten immediately informed the Gary Indiana F.B.I. agents and met them at the location O'Neal described. The agents searched for the body unsuccessfully for several hours. Mitchell returned to Chicago, contacted O'Neal, and requested him to drive to the precise location. Mitchell followed O'Neal's car to a spot where O'Neal got out of the car and motioned. Roten arranged for the Indiana State Police to then do a terrain search. When they arrived Mitchell told them to take the body to the morgue and register it under John Doe so that no one would know Beard's body had been recovered.

Mitchell spoke with O'Neal again on May 23. O'Neal informed Mitchell that Robinson had another contract to kill a man named Jeepers. Mitchell asked O'Neal to persuade Robinson to give him the contract. That day Mitchell called Robinson into the F.B.I. for questioning. Mitchell stated that

this was done to let Robinson know that the F.B.I. was aware of him. Mitchell believed this would ensure that O'Neal would get the Jeepers contract. Robinson in fact did give the Jeepers contract to O'Neal.

Mitchell then established Jeepers identity and persuaded him to accept voluntary confinement on May 25. Mitchell gave O'Neal several of Jeepers personal belongings so that O'Neal could prove to Robinson that he had murdered Jeepers.

Some time during the summer of 1972 Mitchell and Roten met with Charles Kocoras, an Assistant United States Attorney, to discuss the Robinson investigation. Kocoras testified at trial that the prosecutor's office decided not to seek an immediate arrest warrant for Robinson. He stated that this was done because Robinson had disappeared and because a thorough investigation was necessary to establish essential corroboration. He also stated that O'Neal was not arrested because he "did not directly participate in the crimes." The U. S. Attorney did not obtain an arrest warrant for Robinson until February, 1973.

## II

■ The plaintiff does not contend that the jury verdict exonerating agent Mitchell was against the weight of the evidence. Plaintiff does argue that she is entitled to a new trial because the jury was not properly instructed on the law.[8] Plaintiff alleges five substantive errors in the instructions. First, she complains that the judge did not give her requested instructions on possible theories of liability, and in particular, that he failed to define the significance of O'Neal's conduct in assessing liability to Mitchell. Second, plaintiff argues that the judge applied the wrong standard of intent by instructing the jury that recklessness was required. She also maintains that the

judge misplaced the burden of proving the defendant's culpability. Her remaining claims of substantive errors are that the judge instructed the jury that Mitchell was entitled to a good faith defense and that he improperly instructed them on the application and meaning of proximate cause.

### A

■ Plaintiff disputes the propriety of each of the instructions given by the trial judge on the standards of intent and culpability requisite to an action against a federal officer for deprivation of civil rights.

The judge instructed the jury that: "[Y]ou must find for the defendant, Mr. Mitchell, if you conclude that his actions were merely inadvertent or negligent," and that the plaintiff has the burden of proving that the "personal acts of Mr. Mitchell were done either intentionally or with a reckless disregard."

[I]ntent . . . as used in these instructions, does not require a finding that actions were taken or omitted with a purpose, motive or specific intent to deprive one of his constitutional rights as this phrase encompasses both the special intent to deprive Jeff Beard of his constitutional rights and the general intent to perform acts, the natural consequences of which were the deprivation of a constitutional right of Jeff Beard.

A person is reckless or acts recklessly when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow and such disregard constitutes a gross departure from the care which a reasonable person would exercise in this situation.

Plaintiff finds three errors in this instruction. She argues that either strict liability or negligence, but not recklessness, is the

---

8. Plaintiff also challenges the procedure employed by the judge in ruling on the requested instructions. Rule 51 requires the trial court to advise counsel of the court's instructions prior to counsel's arguments to the jury. Plaintiff contends that the judge did not advise them properly with respect to substituted instructions. We find first that most of plaintiff's

instructions were given in substance. *Wabash R. R. v. Zirzow,* 245 F.2d 790 (7th Cir. 1957). Moreover, we have read the closing argument of counsel and find that there could not have been any prejudice as counsel was fully able to argue his theory of the case to the jury. *See Hetzel v. Jewel Co., Inc.,* 457 F.2d 527, 535 (7th Cir. 1972).

appropriate standard of intent. Even if recklessness were the standard, plaintiff maintains that the judge erred by giving a "subjective" rather than an "objective" recklessness standard. Finally she contends that the plaintiff should not have been assessed the burden of proving defendant's culpability, i. e. that his conduct was unreasonable. We find that the instruction accurately reflects our holdings in this field of law.

After our decision in *Bonner v. Coughlin,* 545 F.2d 565 (7th Cir. 1976) (*en banc*), *cert. denied,* 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 529 (1978), we are surprised at the vigor. with which plaintiff argues that Mitchell can be held liable for negligently causing Jeff Beard's death. This court, in an *en banc* opinion, refused to recognize a cause of action premised on negligence, holding that intentional conduct or "reckless disregard" was an essential element of a civil rights claim. Plaintiff contends that the *Bonner* intent standards were formulated for the limited context of claims arising under the Eighth Amendment. The reasoning in *Bonner* is not so limited, and in fact this court has previously held that recklessness is required to recover for deprivations of life, liberty or property without due process under the Fourteenth Amendment.[9] *See Fulton Market Cold Storage Company v. Cullerton,* 582 F.2d 1071, 1080 (7th Cir. 1978) (property); *Jamison v. McCurrie,* 565 F.2d 483, 486 (7th Cir. 1977) (life). In *Jamison,* an individual went to the police on three consecutive days informing them that his father had been threatening his family with guns. The son requested assistance but the police provided none. Shortly thereafter, the father killed an individual named O'Malley, who was not a family member. This court held that "[t]here is no constitutional cause of action for mere negligence on the part of police officers in a case such as this. The plaintiff must show

that their misbehavior was either intentional or in reckless disregard of his constitutional rights." *Id.* at 486.

■ Nor do we think the judge's formulation of the recklessness standard is grounds for reversal in this case. Plaintiff argues that this court's decision in *Little v. Walker,* 552 F.2d 193 (7th Cir. 1977), *cert. denied,* 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 530 (1978), requires proof of only objective recklessness. She urges that the trial court's use of the phrase "conscious disregard" of the risks allowed the jury to conclude improperly that if Mitchell was not consciously aware of the risks then he could not be found reckless. Even if the insertion of the word "conscious" does suggest a subjective standard, it could not constitute prejudicial error in this case.[10] Quite simply, the jury could not have concluded on the evidence presented that Mitchell was unaware of the risk that Robinson would continue to murder individuals unless arrested, or unaware of the risk that O'Neal might actively assist Robinson in effectuating a murder. Mitchell testified at trial that he was fully aware of those risks. He admitted that he anticipated further violence and foresaw the possibility that O'Neal might assist Robinson in the manner he did.[11] The plaintiff's lawyer clearly recognized that Mitchell did not rely on subjective unawareness of the risks as a defense. He pointed out to the jury that this was *not* a case where Mitchell had testified "Gee, I am surprised that more murders happened." No confusion could have resulted from the trial judge's phrasing.

■ The trial judge also properly allocated the burden of proving that Mitchell's conduct was a "gross departure from the care which a reasonable person would exercise in this situation." Plaintiff argues that the reasonableness of the conduct is a component of the good faith defense on which

---

9. The plaintiff does not argue that the intent standard is reduced for claims against federal officers under the Fifth Amendment.

10. The word "disregard" itself suggests a "conscious" act. Nonetheless, to avoid confusion it

is probably appropriate to delete the word "conscious" from the instruction.

11. Mitchell testified that he instructed O'Neal to be prepared to shoot Robinson instead.

the defendant carries the burden of proof. In fact the plaintiff maintains that substantial confusion resulted by requiring the plaintiff both to prove the unreasonableness of the conduct while also instructing that Mitchell had the burden of proving reasonably-based good faith.

The judge certainly did not err by requiring the plaintiff to establish the unreasonableness of the conduct. The term "recklessness" does encompass the separate elements of intent and culpability. There can be no question, however, that both are necessary components of a claim of Fifth Amendment (or Fourteenth Amendment) deprivations. In order to establish a Fifth Amendment violation the plaintiff must demonstrate not only that the defendant must have acted with the knowledge that harm might ensue to the plaintiff, but also that such conduct was unreasonable or culpable.

■ Plaintiff misconstrues the nature of a "constitutional tort." The loss of constitutionally protected rights, whether life, liberty or property, does not automatically translate into a cause of action against a government actor. The loss must have occurred because of the official's *unconstitutional conduct*. Conduct is not unconstitutional merely because it may proximately cause harm to a citizen. In the context of the Fifth Amendment, the conduct is only unconstitutional if it is violative of the standard of care due the citizen under those circumstances. *See Rodriguez v. Ritchey*, 556 F.2d 1185, 1195, 1202 (5th Cir. 1977) (dissent). As the Supreme Court stated in *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), the Due Process Clause " 'raises no impenetrable barrier to the taking of a person's possessions,' or liberty, or life. . . . [D]ue process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." *Id.* at 259, 98 S.Ct. at 1050.

This court has emphasized the culpability component of a civil rights claim. In *Bonner v. Coughlin,* this court stated that "[t]he guards' *culpability* here was not of sufficient magnitude to constitute a deprivation of rights under Section 1983." 545 F.2d at 567 (emphasis added). The holding could nowhere be more clear than in *United States ex rel. Miller v. Twomey,* 479 F.2d 701 (7th Cir. 1973), *cert. denied,* 414 U.S 1146, 94 S.Ct. 900, 39 L.Ed.2d 102 (1974). In an opinion by then Judge Stevens, the court found that to establish a constitutional cause of action the plaintiff must prove more than the fact government officials had made decisions with the foreseeable risk that violence would result from their decisions. This alone was not enough to require the defendants to "prove their good faith in an evidentiary hearing." *Id.* at 721. The plaintiff must prove that the official acted in violation of the Constitution and thus in violation of the care due a citizen.[12]

■ The judge further instructed the jury that even if they found that Mitchell had acted recklessly, proximately causing Jeff Beard's death, they should not find him guilty if Mitchell had proven that he

was acting in the good faith belief that his acts were proper and that belief was reasonable under the circumstances. This is so because, even if he is misinformed as to the facts, an investigating officer who acts with the reasonable good faith in belief as to the validity of his actions is not liable for a violation of another's civil rights . . . . .

---

12. The plaintiff supports her contrary construction by reliance on cases such as *Boscarino v. Nelson,* 518 F.2d 879, 881–82 (7th Cir. 1975) and *Martin v. Duffie,* 463 F.2d 464, 468–69 (10th Cir. 1972). Plaintiff states that in *Boscarino* the plaintiff was required only to prove the constitutional deprivation—an unlawful search—and that the defendant was then permitted to prove the good faith or reasonableness of his conduct. Our holding here is entirely consistent. The plaintiff in *Boscarino* did have to prove culpability in that he had to prove not merely that he was *searched,* but that the search was unlawful, *i. e.* unreasonable under the Fourth Amendment. Thus a plaintiff must always establish a constitutional deprivation and that can be accomplished only by demonstrating the loss of constitutionally protected rights as a consequence of unconstitutional conduct. *See Baker v. McCollan,* —— U.S. ——, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979).

This instruction does not duplicate the plaintiff's burden of proving unreasonable conduct. Mitchell was entitled to prove that his *belief* in the legality of his acts was reasonable but was not required to prove that his *conduct* was reasonable. The questions are distinct. For example, if the jury members had determined that it was grossly unreasonable for Mitchell to use a criminal informant, they still could have exonerated him if they found that he was merely acting in accordance with F.B.I. guidelines in the reasonable belief that such conduct would thereby be lawful.[13]

*Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978) and *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) do hold that there can be no good faith defense available in an action to recover for the deprivation of "clearly established" constitutional rights. Since the right to life is clearly established, plaintiff argues, a good faith instruction was impermissible. Availability is not so narrowly measured however. In *Chapman v. Pickett*, 586 F.2d 22 (7th Cir. 1978) we held that *Wood* is not invoked merely by demonstrating the loss of a clearly protected interest—there the free exercise of religion. Instead it must also be shown that it was "clearly established" that the conduct in question was unconstitutional.[14] In *Chapman* the court permitted a good faith defense to a prison official who had punished the plaintiff for refusing to obey an order to handle foodstuffs forbidden by his religion. Because various curtailments of religious freedoms are constitutional, the court found the conduct in question was defensible under the *Wood* standard. "[T]he right in question must have been established in a more particularized way . . . ." *Id.* at 25.

■ The evidence amply supported the inclusion of a good faith instruction in this case as well. There can be no question that in some circumstances law enforcement acts or omissions which may be a contributing cause of injury are not invariably constitutional violations. There was extensive evidence on F.B.I. policies for conducting investigations. It was demonstrated both that the F.B.I. actively encouraged the use of criminal informants and that arrests were ordinarily not to be made on the basis of informant accounts without corroborating information. Since those F.B.I. policies have not previously been found unconstitutional,[15] if the jury believed that Mitchell was reasonably attempting to act in conformity with these F.B.I. guidelines, it could have found good faith.[16]

#### B

■ The plaintiff does not limit her challenge to the intent-related instructions. She also urges that the judge's instructions on proximate causation were deficient.

On proximate cause, the judge instructed: you must also determine whether that personal involvement is the proximate cause of any deprivation of Jeff Beard's constitutionally protected rights.

Injury or damage is proximately caused by an act or a failure to act whenever it appears from the evidence that the act or failure to act in the natural or probable course of events brought about the injury or damage and the injury or damage was of such a character that an ordinarily

---

13. The plaintiff's claim that the instruction permitted the jury to exculpate Mitchell on the basis of a subjective belief that his actions were lawful is meritless. The judge uses the word "reasonable" as a modifier in both sentences of the instruction. Further, he elsewhere characterized the defense as "a reasonable and honestly held belief that his actions were lawful."

14. Plaintiff's position here is similarly premised on the position rejected above, that a deprivation is established by demonstrating a certain type of injury without regard to culpability.

15. *See, e. g., Butler v. Goldblatt Brothers, Inc.,* 589 F.2d 323 (7th Cir. 1978).

16. John Otto, an expert witness, testified that Mitchell's actions, as testified to by Mitchell, were in conformity with F.B.I. code of operating procedures. Thus if the jurors believed Mitchell's version of his knowledge and conduct (which is not substantially in dispute) they certainly could have found good faith.

prudent person could reasonably foresee it as being likely to occur. This does not mean that the law recognizes only one proximate cause for an injury or damage. On the contrary, many factors or things or the conduct of two or more persons may operate at the same time, either independently or together, to cause injury or damage. In such a case each may be a proximate cause.

Plaintiff insists that this instruction misled the jury to believe that Mitchell's conduct had to be the "sole" proximate cause because he twice used the phrase "*the* proximate cause." The cases plaintiff cites to support reversal represent instructions with such great internal inconsistency that the jury could not have understood the legal definition of proximate cause. *See, e. g., Bender v. Dingwerth,* 425 F.2d 378, 382 (5th Cir. 1970). This court refused in *Allers v. Bohmker,* 199 F.2d 790 (7th Cir. 1952) to reverse on the basis of a proximate cause instruction that did not even include the explanation that there could be multiple proximate cause. Thus the instruction clearly is not, and should not be, reversible error.[17]

## C

The most formidable errors urged by plaintiff are those relating to the theory of liability instructions. Plaintiff requested the trial judge to specifically instruct on her theories of liability. Plaintiff argued for both direct and supervisory theories of liability. Plaintiff argued that Mitchell could be held liable directly for failing to prevent, through arrest or otherwise, Jeff Beard's death. Plaintiff's supervisory theory was premised on the view that O'Neal's actions on the night of the murder were a proximate cause of the murder. Thus, even if Mitchell was not reckless in failing to prevent the murder he was reckless in using O'Neal in the investigation, who was a proximate cause.

■ Plaintiff submitted instructions on these theories which the trial judge did not give to the jury verbatim. A party does have a general right to have instructions presenting his theory of the case. *Florists' Nationwide Telephone Delivery Network v. Florists' Telegraph Delivery Association,* 371 F.2d 263, 270 (7th Cir.), *cert. denied,* 387 U.S. 909, 87 S.Ct. 1686, 18 L.Ed.2d 627 (1967). The failure to submit the requested instructions will not be reversible, however, in at least three circumstances relevant to this case. First, if the requested instruction is given "in substance" there is no error. *United States v. McPartlin,* 595 F.2d 1321 at 1342 n.26 (7th Cir. 1979). Second, even if the jury is only given a general instruction without being given the specific theory of the case, the refusal will not be reversible if the party's theory of the case was apparent throughout the course of the trial. In *Delancey v. Motichek Towing Service Inc.,* 427 F.2d 897 (5th Cir. 1970) the court emphasized that if the "nature and validity of the plaintiff's theories were sufficiently brought home to the jury by the testimony and the inquiries of counsel of witnesses for both sides and by the trial court's marshalling of the evidence," there could be no error in only submitting a general instruction to the jury. *See also Oliveras v. United States Line Co.,* 318 F.2d 890, 893 (2d Cir. 1963); *Allers v. Bohmker,* 199 F.2d 790 (7th Cir. 1952). Finally, plaintiff has no right to the presentation of an instruction unsupported by the evidence adduced at trial. *Coughlin v. Capitol Cement Co.,* 571 F.2d 290, 305 (5th Cir. 1978); *Florists' Nationwide Telephone Delivery Network v. Florists' Telegraph Delivery Association,* 371 F.2d 263, 270 (7th Cir.), *cert. denied,* 387 U.S. 909, 87 S.Ct. 1686, 18 L.Ed.2d 627 (1967). We conclude that the instructions tendered were proper for each of these reasons.

■ First, we consider the supervisory instructions. Acknowledging that Mitchell

---

**17.** The plaintiff also argues that the proximate cause instruction was prejudicial because it did not adequately apprise the jury that Mitchell could be liable if his acts "caused Jeff Beard to be subjected" to a deprivation of his rights. We think the instruction is satisfactory in this regard but note that in any event the judge also instructed the jury that Mitchell could be held liable if "acting or failing to act [he] *subjected* Jeff Beard to a deprivation of his constitutionally protected rights." (Emphasis added).

could not be held liable under a respondeat superior theory—*see, e. g., Fulton Market Cold Storage Co. v. Cullerton,* 582 F.2d 1071, 1080 (7th Cir. 1978)—plaintiff forwarded three alternate theories of supervisory liability. Plaintiff requested that the jury be instructed that they could find Mitchell liable if

1. O'Neal was acting at Mitchell's direction or

2. with his knowledge and consent (express or implied), or;

3. Mitchell recklessly failed to properly train or supervise O'Neal and that failure was a proximate cause of Beard's death.

The judge's instruction to the jury, set out in the margin,[18] clearly conveyed that Mitchell could "act through others to deprive Jeff Beard of or subject Jeff Beard to a deprivation of his constitutional rights." In particular the requisite personal involvement is met by proof that "the arrest and subsequent murder of Jeff Beard by Stanley Robinson took place at Mr. Mitchell's direction or with his knowledge or consent." The judge instructed that personal involvement was met "alternatively" by establishing that "defendant acted or failed to act with a deliberate or reckless disregard of Jeff Beard's constitutional rights." He further stated that "in this connection" the jury was entitled to consider the relevance of Mitchell's knowledge of O'Neal's involvement in Robinson's acts.

Although not entirely explicit, the instructions certainly suggested the substance of the theories advanced by plaintiff. Moreover the general charge given to the jury that Mitchell could be liable if he "acted or failed to act with a deliberate or reckless disregard of Jeff Beard's constitutional rights" did authorize the jury to find Mitchell liable on any of the theories advanced by plaintiff. It is not really plausible to argue that the jury was unaware of the plaintiff's theory that Mitchell was reckless with regard to his training, supervision and continued use of O'Neal. Counsel's statements in open court, colloquies with the judge, opening and closing arguments and hours of witness testimony on the topic fully exposed the jury to plaintiff's theories. Unless there is substantial reason to believe that the jury did not recognize that it was entitled to find liability on the basis of certain facts in evidence we would be extremely reluctant to reverse. As this court stated in *Allers v. Bohmker,* 199 F.2d 790, 792 (7th Cir. 1952), "if the instructions as a whole, when viewed in the light of the evidence, show no tendency to confuse or mislead the jury with respect to the principle of law applicable to the issues"

---

**18.** Personal involvement of the supervisory official, like the defendant Mitchell, is the touchstone of his liability as supervisory officials are not liable for civil rights violations under either a theory of respondeat superior or vicarious liability. By that I mean that a supervisor is not liable based solely upon the fact that certain acts are those of his subordinate.

Members of the jury, personal involvement does not mean only that Roy Martin Mitchell had personally, with his own hands, deprived Jeff Beard of his constitutional rights. The law recognizes that Roy Martin Mitchell can act through others to deprive Jeff Beard of or subject Jeff Beard to a deprivation of his constitutional rights. Thus, the plaintiff meets her burden of proof as to personal involvement if she proves by a preponderance of the evidence that the arrest and subsequent murder of Jeff Beard by Stanley Robinson took place at Mr. Mitchell's direction or with his knowledge or consent.

Alternatively, the plaintiff meets her burden of proof as to personal involvement if she proved by a preponderance of the evidence that the defendant acted or failed to act with a deliberate or reckless disregard of Jeff Beard's constitutional rights.

In this connection, from examining the pattern of O'Neal's conduct prior to and during the FBI investigation relating to Stanley Robinson to the extent that you conclude that Roy Martin Mitchell had knowledge of that pattern of conduct, you may infer, but you are not required to do so, that Mr. Mitchell had knowledge of O'Neal's involvement in the acts of Stanley Robinson to which this case has relevance. The relevance of such knowledge, if any will be for you to determine.

In this connection you should also note that as a special agent for the Federal Bureau of Investigation, Mr. Mitchell was required to follow all pertinent FBI policies, rules and regulations. In the event that you conclude Mr. Mitchell either did follow or failed to follow such FBI policies, rules and regulations, you should give that compliance or failure to comply such weight as you determine it deserves.

they should not be disturbed at the appellate level.

■ We also must add that we have serious doubts in any event that the evidence adequately supported the plaintiff's theory of the case. First, we have great difficulty describing O'Neal's conduct as a proximate cause of Beard's death [19] without definitely holding that he had a fixed duty to prevent the crime.[20] Even assuming that his assistance was a proximate cause, there is no evidence that Mitchell encouraged O'Neal to violate anyone's rights. Mitchell testified that he instructed O'Neal to avoid participation in criminal acts. O'Neal testified that he fully understood that he was to avoid such participation and believed that he could be prosecuted for murder should he cause someone's death. Although Mitchell had knowledge that O'Neal had participated in the criminal acts of others to some extent, he certainly had no knowledge that O'Neal had proximately caused an individual's death or serious injury. On the other hand, Mitchell did have knowledge that O'Neal had previously prevented serious crimes from occurring. It is therefore difficult to believe that a jury could have found Mitchell was *reckless* in his training and continued use of O'Neal. John Otto, the expert witness on F.B.I. policy, concluded that rather than terminating O'Neal during the course of the investigation, Mitchell "would be fortunate if [O'Neal] would not terminate himself." Without exhaustive discussion of the evidence we state our conclusion that the trial court could have determined that there was not enough evidence "from which the jury could have inferred the requisite unlawful behavior" thereby relieving any necessity to tender the specific instructions offered. *Coughlin v. Capitol Cement Co.*, 571 F.2d 290, 305 (5th Cir. 1978). Thus on any of these bases, we conclude the judge did not commit reversible error in his charge to the jury.

■ We find similar weaknesses in plaintiff's claim that her theory of direct responsibility was not properly presented to the jury. The plaintiff requested that the jury be instructed that Mitchell "had a duty to attempt to prevent Mr. Beard's abduction or murder" and that he could be held liable to plaintiff if "in reckless or deliberate disregard of that duty, [he] failed to attempt to prevent Jeff Beard's abduction or murder." The judge did not give this instruction verbatim but he did instruct the jury that "to the extent they can reasonably be expected to do so, one of the obligations of law enforcement personnel is the safeguarding and protection of property and lives." We think the trial court description of Mitchell's duty is in fact a more accurate reflection of the law [21] and adequately served to inform the jury that Mitchell's conduct must have conformed to that duty.[22]

**19.** The evidence strongly suggested that although O'Neal can be said to have assisted by driving the car, and by perhaps offering some *verbal encouragement, Robinson would have* murdered Beard in any event. The record shows that he murdered several individuals on prior occasions without assistance from O'Neal. He had other accomplices besides O'Neal including at least one other police officer. Further Robinson made clear that he intended to murder Beard on May 17 without O'Neal. O'Neal was only included because of his own request to be included. Without question the results of the evening were tragic. The jury certainly could have concluded however that O'Neal's presence was more likely to prevent Beard's death than to cause it.

**20.** We find it unnecessary to answer this question since plaintiff did not request an instruction to this effect. We note however that infor-

mants are not police officers with a general duty to the public. On the other hand we are also unaware of any authority that concludes an informant is under no duty to prevent criminal acts.

**21.** The plaintiff's instruction is suggestive of a specific duty to Jeff Beard rather than just a general duty to the public. There is no dispute that Mitchell had no knowledge of Jeff Beard prior to his murder.

**22.** We also find no reversible error in the section of the judge's instructions regarding the relevance of Mitchell's violations of F.B.I. policy. See note 18 *supra*. None of the infractions supported by the evidence warranted the use of a "recklessness *per se*" standard as urged by the plaintiff.

Although we consider the instruction sufficient, we note that it is also questionable whether plaintiff produced sufficient evidence to support submission of this theory to the jury. Reckless failure to prevent harm is a heavy burden to carry and we think the facts in this case may well fall short of those suggested as sufficient in *United States ex rel. Miller v. Twomey*, 479 F.2d 701, 721 (7th Cir. 1973), *cert. denied*, 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 102 (1974) and *Jamison v. McCurrie*, 565 F.2d 483, 486 (7th Cir. 1977). We would certainly be reluctant to embrace a rule of law which *constitutionally required* an investigating officer to arrest an individual in the early stages of an investigation. Such a rule has in fact been rejected in other contexts. *See United States v. Jones*, 173 U.S. App.D.C. 280, 285–89, 524 F.2d 834, 839–43 (1975) (pre-arrest delay not violative of defendant's due process); *United States v. Cowsen*, 530 F.2d 734, 737 (7th Cir. 1976), *cert. denied*, 426 U.S. 906, 96 S.Ct. 2227, 48 L.Ed.2d 831 (1976); *Hoffa v. United States*, 385 U.S. 293, 310, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). As the court stated in *Jones* :

> The . . . diligence requirement does not require police to drop all else in order to concentrate totally on apprehending a single individual. Nor, we believe, does it require this court painstakingly to review police conduct to determine, with the aid of judicial hindsight, whether the agents might have employed their investigative resources in a more efficient manner.

173 U.S.App.D.C. at 289, 524 F.2d at 843 n.18.

This conclusion is particularly important since a premature arrest not only may hamper law enforcement, but also it may subject the official to damages for false arrest. We recently held that police officers were liable for arresting a party on the basis of only two informants' accounts. In *Butler v. Goldblatt Bros., Inc.*, 589 F.2d 323, 325–26 (7th Cir. 1978), this court concluded that liability could be found because the police "did not undertake an independent investigation to corroborate the details of the accusations" and since they had "no first hand knowledge of any facts." Since the jury rendered a verdict for the defendant, we need not determine whether liability in this case would have contravened the Supreme Court warning in *Hoffa* that

> The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long.

385 U.S. at 310, 87 S.Ct. at 417.

### III

A properly instructed jury reached a verdict in favor of the defendant. Plaintiff maintains however that the trial judge made numerous trial errors which prejudiced the presentation of her case to the jury. We find no reversible error.

### A

■ Plaintiff argues that the trial court committed two errors in conducting the voir dire of the jury. We agree that he made one, but it is clearly harmless.

The trial court permitted only one peremptory challenge in the selection of alternate jurors. Rule 47(b) of the Federal Rules of Civil Procedure does permit two peremptory challenges when three or four alternates are chosen. Here four alternates were chosen. Since none of the four alternates were ever required to replace any juror, however, the error clearly could not have been prejudicial.

The other alleged error is more substantial. Plaintiff requested the trial court to question each of the potential jurors about their attitude toward the Federal Bureau of Investigation. In his opening comments to the group of prospective jurors, the judge asked the group whether any of them were acquainted with any official of the F.B.I. No one raised their hand. In conducting the first individual inquiry, of Mrs. Carlstedt, which was done in the presence of the rest of the group, the judge extended the inquiry. The judge said:

You have heard me mention the name of the Federal Bureau of Investigation familiarly known to all of us as the "FBI". I get the impression from reading the papers in this file that we might hear something from the witness stand about the Federal Bureau of Investigation. Would you have any feelings for or against a person who had some association with the Federal Bureau of Investigation?

Mrs. Carlstedt responded in the negative. The judge continued with the individual inquiries but did not again repeat the question he had asked Mrs. Carlstedt. He did ask each prospective juror whether there was "anything you have heard today that would lead you to feel that you could not be a fair and impartial juror in this case." The plaintiff maintains that this inquiry was not sufficient under the voir dire standards maintained in this circuit.

■ This circuit has been zealous in its protection of probing voir dire. *See United States v. Dellinger*, 472 F.2d 340 (7th Cir. 1972), *cert. denied*, 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973); *United States v. Lewin*, 467 F.2d 1132 (7th Cir. 1972). There is of course no rigid standard for determining the adequacy of the voir dire. As the court in *Dellinger* phrased it, "[t]he focus is exclusively on whether the procedure used for testing impartiality created a reasonable assurance that prejudice would be discovered if present." *Id.* at 367. An examination of the voir dire in its totality must reveal questions or commentary adequate "to call to the attention of the veniremen those important matters that might lead them to recognize or to display their disqualifying attributes." *United States v. Lewin*, 467 F.2d 1132, 1138 (7th Cir. 1972).

■ We conclude that the voir dire conducted here did effectively alert the potential jurors to examine their possible prejudice for or against the F.B.I. The voir dire here included the judge's explanation that

the F.B.I. would be involved in the case and that it was important to determine whether any of them might harbor any prejudices in that respect. Although the inquiry was addressed to the first individual, the prospective jurors heard that question and were alerted to its significance. Each juror was then given a specific opportunity to declare any prejudice. The whole voir dire consumed less than two and one-half hours so it is reasonable to assume that each juror was conscious of the judge's inquiry. The efficacy of this manner of inquiry was demonstrated on the record when the last venireman of the day was asked whether anything she had heard might lead her to believe that she might not be able to perform impartially. She responded that she could be impartial but wanted to disclose that her son was a police officer. The trial court properly used this technique in this case to "produce a disclosure of any disqualifying state of mind." *Dellinger*, 472 F.2d at 367. *See also United States v. Batchelder*, 581 F.2d 626, 634 n.14 (7th Cir.), *rev'd on other grounds*, —— U.S. ——, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1978).

### B

■ The plaintiff challenges numerous evidentiary rulings made by the trial judge. The plaintiff first maintains that the trial court improperly excluded three documents evidencing relevant policies and practices of the F.B.I. with regard to the use of informants. The judge refused to admit two sections of the F.B.I. Manual of Instructions establishing standards for the use and training of "security" and "racial" informants.[23] The court did admit the section relating to "criminal" informants since O'Neal was classified as a "criminal" informant throughout the period of the Robinson investigation. The judge refused to admit the other section on the grounds of relevance. We cannot say that the trial court relevancy ruling was erroneous since the

---

**23.** "Racial" informants was the term used by the F.B.I. to characterize those parties who assisted in the F.B.I.'s program to infiltrate a variety of black political parties which the

F.B.I. deemed "Black Nationalist Hate Groups." *See Hampton v. Hanrahan*, 600 F.2d 600 at 608–609 (7th Cir. 1979).

standards for using the different types of informants could not establish Mitchell's culpability in his conduct of the Robinson investigation. Plaintiff counters that since O'Neal had worked with Mitchell in the capacity of a "racial" informant[24] the guidelines would reveal whether Mitchell should have discontinued using O'Neal as an informant before the Robinson investigation ever began. It is doubtful that conduct that remote from Beard's loss of life could properly support the proximate cause necessary to maintain the cause of action.

A third document on F.B.I. policy was also properly excluded on grounds of relevancy. The plaintiffs sought to admit a memorandum prepared by Attorney General Edward Levi on the use of informants in 1976. Mitchell's conduct can only properly be assessed with regard to the policies and practices in effect in 1972. See Ford v. Schmidt, 577 F.2d 408 (7th Cir. 1978). Although plaintiff maintains that the Levi memorandum represents nothing more than a compilation of prior practice, we think that the press release accompanying the document suggests otherwise. The Department of Justice release describes the document as a "copy of the F.B.I. guidelines on the use of informants that Attorney General Edward H. Levi ordered into effect. The guidelines were drawn upon by a special committee appointed by the Attorney General and in cooperation with the F.B.I."

■ The plaintiff also lodges several objections to the manner in which her counsel was permitted to conduct the examination of John Otto. The only objection of merit relates to the trial judge's restriction on impeachment of the witness.[25] Otto was called by the plaintiff to testify as an expert on F.B.I. procedure and policy. Otto gave testimony largely favorable to the defendant. On redirect, the plaintiff endeavored to establish bias by questioning Otto as to whether he had spoken with the defendant's counsel. The court interrupted this line of inquiry stating that since plaintiff had called the witness, "that made him a witness for the plaintiff. Whatever he has testified to, you vouch for it." There is no question that the judge's conclusion was improper under Federal Rule of Evidence 607. Nonetheless this was the trial judge's only comment on the subject and it is doubtful that the jury even understood the former legal significance of the phrase. Moreover, the error was cured by the trial court's instruction that the jury should disregard any expert opinion not based on substantial evidence. We therefore find no reversible error.

■ The trial judge also did not permit the admission of O'Neal's arrest record into evidence. The judge excluded the record on grounds of relevancy. Federal Rule of Evidence 404 does permit the admission of evidence establishing a person's criminal acts if they are relevant to an issue in the case. Beard maintains that the arrest record is relevant in that it evidences Mitchell's knowledge about O'Neal's criminal proclivities. However relevancy of an arrest record must be assessed with regard to the nature and timing of the offenses committed and their relation to the issues in the case. O'Neal's arrest record revealed three convictions: two for theft and one for possession of marijuana. Those convictions occurred prior to the time O'Neal agreed to work as an informant. Subsequent to that time he was arrested, but not convicted, for similar offenses.[26] Thus the question at

24. Id. at 608–612.

25. The plaintiff complains that the trial judge restricted questioning of Otto impermissibly. The plaintiff however was successful in eliciting the information upon rephrasing the question. Plaintiff also argues that the trial court denied her counsel the opportunity to use leading questions. The record, however, demonstrates that the trial court never made such a ruling and reserved the question for a time when objections were raised on that basis. No objection was in fact ever made. Finally the plaintiff complains that she was not permitted to question Otto as an adverse witness but only as an expert. Plaintiff's counsel however informed the trial court that "I tender him as an expert, your Honor."

26. O'Neal's record reveals one arrest for conspiracy to commit murder. This apparently occurred during his activity as an F.B.I. informant during the F.B.I.'s infiltration of the Black Panther Party.

issue is whether the knowledge that O'Neal was arrested a number of times for possession of marijuana and theft would make it more likely that Mitchell should have anticipated that O'Neal might participate in the deprivation of Jeff Beard's rights as alleged to have occurred. The admission of evidence with only remote relevance to the issues in the case is properly lodged in the discretion of the trial court. *United States v. Bolin*, 514 F.2d 554, 558–59 (7th Cir. 1975); *United States v. Catalano*, 491 F.2d 268, 273 (2d Cir. 1974).[27]

The trial judge permitted Kocoras, the Assistant U. S. Attorney assigned to the Robinson case, to testify at trial that defendant Mitchell had a reputation for truthfulness. The plaintiff contends that this was an impermissible use of reputation evidence under Rule 608(a) of the Federal Rules of Evidence. The plaintiff concedes that she introduced prior inconsistent statements by Mitchell as a means of attacking his credibility but maintains that Rule 608 does not permit the admission of this type of evidence to counter impeachment accomplished by prior inconsistent statements.

Rule 608(a)(2) provides that "evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence *or otherwise*." (Emphasis added). The use of prior inconsistent statements may constitute an attack on truthfulness. The Supreme Court noted in *United States v. Hale*, 422 U.S. 171, 176, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975) that "[a] basic rule of evidence provides that prior inconsistent statements may be used to impeach the credibility of a witness." Thus we can not conclude that the trial judge abused his discretion in allowing the testimony.[28]

The final evidentiary error alleged by plaintiff relates to the admission of O'Neal's deposition testimony. As will be

discussed, O'Neal was not available to testify at the trial. O'Neal had testified at two trials and had given two depositions on issues relevant to the action. The plaintiff sought to integrate the testimony from the four sources and present it in correspondence with the chronological sequence of events. The plaintiff was permitted to present the testimony in this manner during the first day of the trial after which defendant objected. The trial court ruled in favor of the defendant finding that this presentation of the testimony was confusing and had a high risk that false inferences might be drawn.

While we agree with the plaintiff that in some cases it may well be permissible for the trial court to permit the integrated presentation of deposition testimony, *see, e. g. United States v. Jackson*, 549 F.2d 517 (8th Cir.), *cert. denied*, 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977), we do not agree that the refusal to allow it is error. Federal Rule of Evidence 611(a) provides: "The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." Our review of the transcript demonstrates that the judge properly weighed these considerations in making his determination. During the course of plaintiff's "integrated" presentation on the first day of trial, the judge commented that he was finding it very difficult to "make intelligent rulings or intelligent objections" because of the manner of presentation. The defendant was also expressing difficulty exercising his right to supplement the reading by deleted portions of the transcript as allowed under Rule 106. The trial court ruling was proper.

**27.** The same principles of discretion support the trial judge's restriction of plaintiff's attempted examination of Mitchell with respect to discussions he may have had with O'Neal after Jeff Beard's death.

**28.** See the advisory committee notes to Rule 608: "Whether evidence in the form of contradiction is an attack upon the character of the witness must depend upon the circumstances."

C

 A final trial error cited by plaintiff[29] was the judge's denial of Beard's application for a writ of habeas corpus ad testificandum. A trial subpoena for O'Neal was properly quashed because it was served more than 100 miles from the Northern District of Illinois. The plaintiff responded by requesting the trial court to issue a writ of habeas corpus ad testificandum to secure O'Neal's presence at the trial. The writ is ordinarily issued to prison wardens to secure the presence at trial of individuals held in governmental custody.

The plaintiff premises use of the writ in this case on the fact that O'Neal is a participant in the federal witness protection program administered by the United States Marshal Service, which the plaintiff characterizes as "custody" justifying issuance of the writ. Without undertaking any exhaustive analysis of the history or potential uses of the writ we do not think it is available here for a variety of reasons.

O'Neal's absence at trial is totally unrelated to his participation in the witness protection program. The United States Marshal has not prevented O'Neal from attending the Beard trial. It was in fact Rule 45 of the Federal Rules of Civil Procedure which permitted O'Neal to decline the request to appear at trial. The trial court could see no reason why an individual participating in the witness protection program should be required to attend a trial that other individuals outside the scope of the subpoena power would not be required to attend. We are in agreement. If O'Neal had indicated that his absence from the trial was attributable to a restriction imposed by the federal marshal, the result might well be different. *See Special Prosecutor v. Untied States Attorney for the*

Southern District of New York, 375 F.Supp. 797, 806 (S.D.N.Y.1974).

Even if the writ were applicable in these circumstances, its issuance would be discretionary. In *Stone v. Morris*, 546 F.2d 730, 735 (7th Cir. 1976) the court articulated the test: "[T]he trial court must weigh the interest of the plaintiff in presenting his testimony in person against the interest of the state in maintaining the confinement of the plaintiff-prisoner." Thus even if the writ were available we would not be inclined to find an abuse of discretion.

 The defendant Mitchell was found not guilty by a jury properly instructed on the law after the completion of a lengthy and fair trial. We therefore affirm.[30]

---

**29.** Plaintiff also alleges bias on the part of the trial judge. We find the plaintiff waived this claim by failure to raise it in a timely fashion. *United States v. Patrick*, 542 F.2d 381, 390 (7th Cir. 1976), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977); *Crusan v. Ackmann*, 342 F.2d 611, 613 (7th Cir. 1965).

**30.** We see no need to separately address plaintiff's claim that the suit against Mitchell in his

official capacity should not have been dismissed. Even if the United States could be held liable, the plaintiff's evidence did not demonstrate a triable issue as to their liability. The plaintiff failed to establish the existence of any F.B.I. policy encouraging the deprivation of civil rights, a necessary prerequisite to governmental liability. *See, e. g., Jamison v. McCurrie*, 565 F.2d 483, 485 (7th Cir. 1977).