**Eloise BEARD, as Administratrix of the Estate of Jeff Beard, deceased, Plaintiff-Appellant,**

v.

**William M. O'NEAL, et al., Defendants-Appellees.**

Nos. 82–1893, 82–2096.

United States Court of Appeals, Seventh Circuit.

Argued April 1, 1983.

Decided Feb. 22, 1984.

Robert M. Mark, Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., for plaintiff-appellant.

Gerald C. Peterson, Winston & Strawn, Chicago, Ill., Steven A. Miller, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for defendants-appellees.

Before ESCHBACH and COFFEY, Circuit Judges, and SWYGERT, Senior Circuit Judge.

ESCHBACH, Circuit Judge.

An F.B.I. informant accompanied a murderer on the night that the murderer killed the plaintiff's brother. The issue in this case is whether that informant breached a constitutional duty owed to the murder victim and consequently caused the victim's death. We conclude, based on the undisputed facts, that he did not and thus we affirm the judgment of the district court. It follows from this conclusion that the judgment entered in favor of F.B.I. supervisory officials must also be affirmed.

I.

The facts surrounding the murder of Jeff Beard have been litigated in at least two trials and reported in two opinions of this court. *See United States v. Robinson,* 503 F.2d 208 (7th Cir.1974), *cert. denied,* 420 U.S. 949, 95 S.Ct. 1333, 43 L.Ed.2d 427 (1975); *Beard v. Mitchell,* 604 F.2d 485 (7th Cir.1979). The basic facts have thus become fixed through litigation and time and are not generally disputed in the instant case. We will not again recite the colorful history of William O'Neal, an F.B.I. informant connected with Beard's death; instead we will set forth the salient facts of Jeff Beard's murder over ten years ago.

William O'Neal was considered by the F.B.I. to be an excellent informant. As such, his contact person in the F.B.I., agent Roy Mitchell, encouraged O'Neal to gather information about a Chicago police officer named Stanley Robinson. In April of 1972, therefore, O'Neal accompanied Robinson during several criminal episodes, including a homicide. O'Neal related Robinson's activities to agent Mitchell, who naturally was skeptical about the claim that a police officer was a violent criminal. In accordance with F.B.I. procedure, agent Mitchell reduced O'Neal's statements to writings available for inspection by his superiors.

On the afternoon of May 17, 1972, Robinson called O'Neal and told him that he

would not see O'Neal that evening because of other plans. O'Neal protested that he did not wish to be excluded from any plans. Robinson then explained that his plans consisted of a small job of no interest to O'Neal. Nevertheless, O'Neal did persuade Robinson to include him in the night's activities.

Robinson, accompanied by O'Neal, set out that night to perform a murder contract. Robinson only had a vague description of the target and only knew his first name— Jeff. After driving around searching for Jeff for some time, Robinson acquired some better identification information concerning Jeff. Robinson then returned to the search for 2½ hours until O'Neal stated that he was tired and wanted to go home. While driving O'Neal back to his car, Robinson fortuitously spotted Jeff Beard in a pool hall.

Robinson and O'Neal sat in the car outside of the pool hall for 45 minutes. During that time O'Neal went to a telephone and tried to call agent Mitchell at his home. Mitchell was not at home and O'Neal returned to the car. When Beard finally came out of the pool hall, Robinson approached, arrested, and handcuffed him. Robinson and Beard got in the back seat of the car and Robinson ordered O'Neal to drive to the "Indiana District," which O'Neal interpreted as an instruction to drive south. O'Neal drove south until Robinson, who wanted to make a telephone call, ordered him to exit from the expressway. O'Neal did exit and Robinson left the car for 3 to 5 minutes to make a call.

When Robinson returned to the car, he began driving and told Beard that he was not under arrest but that they wanted him to sell narcotics. After entering Indiana, Robinson pulled off on the shoulder of the road and asked Beard to get out of the car so that they could talk. O'Neal remained in the car. When Beard got out of the car, Robinson shot him; the wound was not fatal however and Beard raced across the

road. O'Neal told Robinson that he had really "messed up." Undaunted, Robinson pursued Beard across the road, caught up with Beard, and murdered him.

O'Neal called agent Mitchell early the next morning and reported the murder of Jeff Beard. Owing chiefly to O'Neal's testimony, Robinson was subsequently convicted on charges of violating Jeff Beard's constitutional rights, see 18 U.S.C. §§ 241, 242. See United States v. Robinson, 503 F.2d 208 (7th Cir.1974), cert. denied, 420 U.S. 949, 95 S.Ct. 1333, 43 L.Ed.2d 427 (1975). Robinson was sentenced to life imprisonment.

In 1976 Eloise Beard brought this action directly under the Constitution, see Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), for damages relating to the murder of her brother. Named as defendants in this suit were O'Neal, agent Mitchell's supervisors in the F.B.I.'s Chicago office, and the acting director of the F.B.I.[1] The plaintiff brought a separate Bivens-type suit against agent Mitchell.

While the instant case was pending, the action against Mitchell went to trial before a jury. The jury returned a general verdict in Mitchell's favor; judgment was accordingly entered, and we affirmed, see Beard v. Mitchell, 604 F.2d 485 (7th Cir.1979). The district court in the present case subsequently cited the Mitchell litigation and ruled that res judicata barred the plaintiff's Bivens-type claims against the F.B.I. officials and O'Neal. The defendants' motions for summary judgment were accordingly granted and these appeals pursuant to 28 U.S.C. § 1291 followed.

## II.

Under the res judicata doctrine, a final judgment on the merits bars further claims by parties or their privies based on the same cause of action. Montana v. United States, 440 U.S. 147, 153, 99 S.Ct. 970,

---

1. The F.B.I. was also named as a defendant but the district court properly dismissed it on the ground of sovereign immunity.

973, 59 L.Ed.2d 210 (1979). Mutuality of parties remains an essential element of the doctrine. *Nevada v. United States,* —— U.S. ——, 103 S.Ct. 2906, 2925, 77 L.Ed.2d 509 (1983). Res judicata bars the present claims against O'Neal and the F.B.I. officials, therefore, only if these defendants are in privity with agent Mitchell.

■ We can discern no basis for holding that all F.B.I. agents and informants, sued individually for their own acts or inactions, are in privity for res judicata purposes. *See Restatement* (Second) *of Judgments* §§ 43–61 (1982). To be sure, Mitchell and all of the defendants in this case are associated with the F.B.I. For res judicata purposes, however, we fail to perceive why this relationship is relevant and why a suit against one F.B.I. agent should be considered a suit against all people associated with the agency.

The case that the defendants cite in connection with their privity argument, *Sunshine Anthracite Coal Co. v. Adkins,* 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263 (1940), provides no support once the case is examined fully and in its historical context. In that case the Court wrote:

> Where the issues in separate suits are the same, the fact that the parties are not precisely identical is not necessarily fatal.... There is privity between officers of the same government so that a judgment in a suit between a party and a representative of the United States is res judicata in relitigation of the same issue between that party and another officer of the government.

*Id.* at 402–03, 60 S.Ct. at 916–17. This holding, however, is a description of the modern doctrine termed "collateral estoppel"—once an issue is actually litigated, that determination is conclusive in a subsequent suit involving *one* party to the prior action. *See Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). At the time *Sunshine Anthracite Coal Co.* was decided, the term "res judicata" was still used to encompass the then emerging doctrine of collateral estoppel, which does not require mutuality of parties. *See* 1B J. Moore, *Moore's Federal Practice* ¶ 0.441[2] (1983). *Sunshine Anthracite Coal Co.,* therefore, stands for the currently unexceptional principle of collateral estoppel that when a person sues a government official, all issues actually litigated are binding in a subsequent suit against another government official.

If agent Mitchell and the current defendants were sued only in their official capacities, then they would clearly be privies. Official-capacity suits are, in reality, suits against government entities—in this case, the F.B.I. *See Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978). Separate suits against F.B.I. officials in their official capacities, therefore, are suits against the F.B.I. and res judicata principles would apply. *See Lee v. Peoria,* 685 F.2d 196, 199 n. 4 (7th Cir.1982).

■ In the absence of privity, the defendants are still entitled to contend that some issues, litigated in the *Mitchell* case adversely to the plaintiff, bars recovery in the present case. Such an argument has some appeal; because agent Mitchell was found not liable to the plaintiff, it might seem to follow that his F.B.I. supervisors must also not be liable.

The jury in *Mitchell,* however, returned a general verdict in the agent's favor. The jury may have found in Mitchell's favor on one or more of several grounds: for instance, (1) that O'Neal did not breach a constitutional duty, (2) that Mitchell was not personally responsible for O'Neal's acts, or (3) that Mitchell was entitled to qualified immunity. On appeal, we expressed serious doubt about whether Mitchell was personally responsible for O'Neal's conduct and whether O'Neal was a proximate cause of Jeff Beard's death. *See* 604 F.2d at 499–500. Given the posture of the appeal, however, our doubt was not translated into holdings. Thus, from reading the general verdict and our opinion in *Mitchell,* it is unclear what issue or issues were decided against the plaintiff. Rather than extend and apply collateral estoppel in this unclear

area, we prefer to affirm the district court's judgments on another ground—one that applies to the F.B.I. officials and O'Neal.

## III.

■ The Fifth Amendment guarantees, among other things, that a person will not be deprived of life without due process of law. Jeff Beard had a constitutional right, therefore, not to be murdered by someone acting under color of federal authority.[2] *See generally Brazier v. Cherry,* 293 F.2d 401 (5th Cir.1961). The plaintiff's suit against O'Neal and the F.B.I. officials is purportedly founded on O'Neal's violation of that right.

At various points the plaintiff alleges that O'Neal "participated" in the events that led to Beard's death. Use of a vague word such as "participate," however, does little to advance the constitutional analysis in this case. A witness or a victim might be termed participants in a criminal episode, yet we would not call them criminals. We must thus analyze O'Neal's specific acts and determine whether this conduct breached a constitutional duty owed to Beard and, if such a breach occurred, whether it may have caused Beard's death.

The plaintiff does not contend that O'Neal is responsible for Robinson's acts in the way that a conspirator might be responsible for a co-conspirator's conduct. It is undisputed that O'Neal did not want Beard killed. On at least two occasions O'Neal took steps to save the lives of people whom Robinson intended to murder. Moreover, O'Neal became associated with Robinson and was with him on the night of Beard's murder only to obtain information for agent Mitchell. Before the murder, in fact, O'Neal attempted to telephone Mitchell to inform him of Beard's peril; tragically, Mitchell was not at home. And shortly after Beard was killed, O'Neal informed Mitchell of the event. In no sense, therefore, can it be said that O'Neal directed or approved of Robinson's conduct.

This case is unlike a situation where a uniformed police officer, who is in a position to prevent violence, observes a murder without intervening in any way. Absent an explanation for the officer's inaction, it might be legitimate to infer that he approved of the murder. Indeed, the officer's presence and authority might facilitate the murder by providing the symbolic support of the government. In such a case, the officer might be personally liable for the acts of the person who operated the murder weapon. The same cannot be said in this case, where O'Neal had reasons (*e.g.*, fear for his safety and loss of his guise) not to take further steps to prevent Beard's murder.

Nevertheless, O'Neal is responsible for his own actions. O'Neal's decision to accompany Robinson on the night of the murder must thus be examined. In essence, the plaintiff contends that O'Neal had a constitutional duty not to be in Robinson's presence on that tragic night.

We hesitate to hold that a long-term government informant has a constitutional duty to refrain from being in a position to witness crimes involving the deprivation of life, liberty, or property. One of the functions of an informant is to witness crimes so that an arrest can be made and future crimes prevented. Robinson was arrested and convicted in large part because of O'Neal's decision to accompany Robinson; had O'Neal remained at home and Robinson escaped criminal liability, the number of Robinson's victims undoubtedly would have grown. We need not rule on the constitutionality of O'Neal's decision to accompany Robinson, however, because the undisputed facts reveal that there is no causal link between O'Neal's acts (as distinguished from his inaction) and Jeff Beard's death.

■ A plaintiff may not recover damages for a constitutional tort without establishing causation in fact—i.e., that the defendant caused the claimed injury. *See Loss-*

---

2. For the purpose of this opinion, we will assume, without deciding, that O'Neal acted un- der the color of federal authority.

man v. Pekarske, 707 F.2d 288, 291 (7th Cir.1983); Arnold v. International Business Machines Corp., 637 F.2d 1350, 1355 (9th Cir.1981); see generally W. Prosser, Prosser on Torts 244 (1971). In one constitutional tort case, Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Supreme Court held that the plaintiff could not recover if the claimed injury would have occurred anyway. A strict application of this "but for" test of causation would deny recovery in the case of joint causation, where either of two forces would have produced the injury independent of the other. It might therefore be appropriate in some cases to apply a broader notion of causation, one that will permit recovery in the case of joint causes. Under either a strict or broad definition of causation, however, O'Neal's actions cannot be described as a cause of Beard's death.

█ The record shows that Robinson murdered several individuals, without O'Neal's assistance, prior to Beard's murder. Robinson further made it clear that he intended to kill Beard on the night of May 17 without O'Neal's involvement. Robinson did not seek or want O'Neal's assistance. For purposes of gathering information, O'Neal insisted on going with Robinson on the night of Beard's murder, but in no way did O'Neal's presence significantly increase Beard's peril. In fact, O'Neal's presence provided a witness, a factor that would make many murderers hesitant. Moreover, O'Neal attempted to contact agent Mitchell to inform him of Beard's danger, thus providing Beard an opportunity to survive that he otherwise would not have had. O'Neal's actions can only be said to have caused Robinson's arrest and conviction, not Beard's death.

Our analysis on causation to this point is little more than a restatement of our observation in Beard v. Mitchell that "we have great difficulty describing O'Neal's conduct as a proximate cause of Beard's death without definitely holding that he had a fixed duty to prevent the crime." 604 F.2d at 499 (footnotes omitted). Given the posture of

that appeal, it was unnecessary for us to decide whether O'Neal's inaction breached a constitutional duty and caused Beard's death. We must now answer that previously unresolved issue.

In a sense, O'Neal's inaction caused Beard's death; if O'Neal had intervened and prevented the crime, Beard would not have been murdered. However, this is merely a tautological statement that could be made about anyone alive at the time of the murder. We each failed to prevent the crime and thus Jeff Beard died. We are all not liable for damages, however, because clearly we did not all have a constitutional duty to intervene. For the sake of clarity, therefore, our focus of attention must be on whether O'Neal had a constitutional duty to act to prevent the murder, not whether O'Neal's inaction caused Beard's death. See generally L. Green, Rationale of Proximate Cause 11–43 (1927).

We hold that O'Neal did not have a constitutional duty to prevent Jeff Beard's murder. In Bowers v. DeVito, 686 F.2d 616 (7th Cir.1982), a case also involving the deprivation of life, we had occasion to discuss the Constitution's guarantee of due process:

> [T]here is no constitutional right to be protected by the [government] against being murdered by criminals or madmen.... The Constitution is a charter of negative liberties; it tells the [government] to let people alone; it does not require the federal government or the state to provide services, even so elementary a service as maintaining law and order.

Id. at 618. O'Neal's failure to take steps to protect Beard may be considered "monstrous," but such failure did "not violate the due process clause of the ... Constitution." Id.; see Fox v. Custis, 712 F.2d 84, 88 (4th Cir.1983); see generally Jackson v. City of Joliet, 715 F.2d 1200 at 1204 (7th Cir.1983).

At oral argument the plaintiff attempted to turn Bowers v. DeVito around to support her case. The plaintiff argued that O'Neal's role was not merely passive because he put Beard in a position of danger just as if he "had thrown him into a snake

pit." *Bowers,* 686 F.2d at 618. We cannot discover, however, any special relationship between O'Neal and Beard that gave rise to a constitutional duty to provide protection. Jeff Beard was a "member[ ] of the general public, living in a free society, and having no special custodial or other relationship with" the F.B.I. or O'Neal. *Fox v. Custis,* 712 F.2d 84, 88 (4th Cir.1983). Neither O'Neal nor any agent of the F.B.I. singled Beard out to be killed. Chicago police officer Stanley Robinson targeted, abducted, and murdered Jeff Beard. The plaintiff's constitutional tort case is against Robinson, not O'Neal and the F.B.I. officials.

Finally, we note that this case is not brought under the Federal Tort Claims Act. Whether the defendants violated some common law duty is thus not an issue on this appeal. Our decision is not based on the common law of Illinois; rather we hold, on the basis of the undisputed facts, that O'Neal committed no constitutional tort that led to the plaintiff's brother's death.

### IV.

■ The F.B.I. defendants may be held liable only if O'Neal committed a constitutional tort for which they were personally responsible. We seriously doubt that the F.B.I. defendants, who never had any immediate contact with O'Neal, could be found personally responsible. *See Lojuk v. Quandt,* 706 F.2d 1456, 1468 (7th Cir.1983); *Crowder v. Lash,* 687 F.2d 996, 1006 (7th Cir.1982). In light of our decision that O'Neal is entitled to summary judgment on the *Bivens*-type claim, however, we may affirm the judgment in favor of the F.B.I. officials without reaching the question of personal responsibility.

The judgments of the district court are affirmed.

SWYGERT, Senior Circuit Judge, dissenting in part and concurring in part.

The death of Jeff Beard at the hands of a Chicago police officer, Stanley Robinson, and in the company of an FBI informant, William O'Neal, has spawned numerous criminal and civil lawsuits. In one Robin-son was prosecuted and convicted of depriving Beard of constitutional rights. *United States v. Robinson,* 503 F.2d 208 (7th Cir. 1974), *cert. denied,* 420 U.S. 949, 95 S.Ct. 1333, 43 L.Ed.2d 427 (1975). In another the administratrix of Beard's estate sought relief under 42 U.S.C. § 1983 (1976 & Supp. V 1981) against Robinson, O'Neal, Roy Martin Mitchell, the FBI agent to whom O'Neal directly reported, and other unknown FBI agents, for conspiring to deprive and actually depriving Beard of life under color of state law. *Beard v. Robinson,* 563 F.2d 331 (7th Cir.1977), *cert. denied,* 438 U.S. 907, 98 S.Ct. 3125, 57 L.Ed.2d 1149 (1978). At least some of these section 1983 claims are still pending. In a third case the administratrix sought relief under the United States Constitution, *see Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), against Mitchell for reckless training and supervision of O'Neal; we affirmed a general jury verdict exonerating Mitchell. *Beard v. Mitchell,* 604 F.2d 485 (7th Cir.1979). Finally, the present action, which the district court refused to consolidate with *Beard v. Mitchell,* was brought, seeking *Bivens* relief against O'Neal for contributing to Beard's death by failing to intervene and by other actions; against Kenneth Grant, an FBI special agent who supervised the FBI's investigation of Robinson, Roy K. Moore, the FBI special agent in charge of the Chicago office, and L. Patrick Gray, the Acting Director of the FBI, for supervisory and policymaking failures in their individual and official capacities; and against the FBI itself. The district court below dismissed the damage claims against the FBI and against the individual defendants in their official capacities on the ground of sovereign immunity; entered summary judgment on the individual-capacity claims against the FBI officers on res judicata grounds, reasoning that the exoneration of Mitchell adversely resolved an element vital to the supervisory liability claims; and entered summary judgment in O'Neal's favor on res judicata grounds, reasoning that *Beard v. Mitchell*

foreclosed FBI liability and that the same reasoning applied to O'Neal. Although it properly rejects the defendants' arguments urging affirmance on res judicata and collateral estoppel grounds, the majority now affirms the grant of summary judgment on the alternative grounds that O'Neal was not an active participant in the murder and owed no duty derivable from the Constitution to prevent it, and that the FBI officers' liability is dependent on O'Neal's. Because I believe these conclusions are not legally compelled, but depend on factual premises not settled in the record, I dissent from that portion of the opinion. I agree, however, that sovereign immunity bars the damage claims against the FBI and the officers in their official capacities.

## I

The majority concludes that Robinson would have killed Beard even without O'Neal's participation, and that O'Neal consequently can be liable for the murder only if he had a constitutional duty to intervene. It correctly states much of the law controlling this potential liability. In *Baker v. McCollan*, 443 U.S. 137, 146, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979), the Supreme Court held that breach of a state-law duty to confirm the identity of arrestees was insufficient to make out a constitutional claim for deprivation of liberty under section 1983, because "[s]ection 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law." I assume this analysis also applies to constitutional claims under *Bivens*. For his conduct to be actionable under *Bivens*, therefore, O'Neal must have owed Beard some duty created by the Constitution. If O'Neal had pulled the trigger or bludgeoned, stabbed, and smothered Beard, as Robinson did, this issue would be easy, for the fifth amendment explicitly forbids the deprivation of life without due process, and such acts clearly deprive the victim of life. The difficulty in this case is determining whether less direct acts may also constitute deprivation, for the term "deprive" is not entirely self-explanatory.

In one case the Supreme Court rejected a section 1983 claim that state officials indirectly deprived a victim of life. In *Martinez v. California*, 444 U.S. 277, 283–85, 100 S.Ct. 553, 558–59, 62 L.Ed.2d 481 (1980), it concluded that state parole officers were not liable for the murder committed by a prisoner they had released, because even if under some circumstances they owed a duty of care under state law in making parole decisions, they did not "deprive" the victim of life because the danger to her was remote and unparticularized. It cautioned, however, that it was not deciding "that a parole officer could never be deemed to 'deprive' someone of life by action taken in connection with the release of a prisoner on parole." *Id.* at 285, 100 S.Ct. at 559 (footnote omitted). *Martinez* thus refines the meaning of "deprivation" by establishing the importance of the directness of the connection between the official's action and the loss of a constitutional right such as life, but does not explicitly establish a yardstick for determining the degree of directness required by the Constitution. Its reference to state law and use of a mode of analysis commonly employed in state tort decisions, *cf. Thompson v. County of Alameda*, 27 Cal.3d 741, 750–53, 614 P.2d 728, 732–34, 167 Cal.Rptr. 70, 74–76 (1980) (psychiatrist liable only to identifiable victims of patient's violence); *Tarasoff v. Regents of the University of California*, 17 Cal.3d 425, 439 & n. 11, 551 P.2d 334, 345 & n. 11, 131 Cal.Rptr. 14, 25 & n. 11 (1976) (same), however, may implicitly suggest that state or other extra-constitutional law be used to particularize the meaning of "deprive." *See Fox v. Custis*, 712 F.2d 84, 88 & n. 3 (4th Cir.1983) (noting parallelism between significance of awareness of the specific risk under section 1983 and common law tort principles). Indeed, state law is routinely used to define other constitutional terms such as "liberty," *see, e.g., Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 869–71, 74 L.Ed.2d 675 (1983), and "property," *see, e.g., Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

But this circuit has steered clear of this mode of analysis. In *Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir.1982), we held that state mental hospital officials were not liable for a knife-stabbing death at the hands of a released patient with a history of similar woundings and killings, not just because the killing was remote and the victim unidentifiable in advance, as in *Martinez,* but also because "[t]he Constitution is a charter of negative liberties," creating no entitlements to positive official action such as crime prevention, but rather only entitlements to be left alone in specified areas. *See also Jackson v. City of Joliet,* 715 F.2d 1200, 1203–05 (7th Cir.1983) (police and firemen have no positive duty to rescue car accident victims), *petition for cert. filed,* 52 U.S.L.W. 3462 (U.S. Dec. 13, 1983) (No. 83–853); J. Ely, Democracy and Distrust 88–101 (1980). Because the duty must come from the Constitution and the Constitution creates no duties of positive action under the strict principles announced by *Baker v. McCollan* and *Bowers v. DeVito,* O'Neal cannot be liable under *Bivens* if his fault was merely failing to be a good Samaritan.

There are two problems with this analysis, however. First, *Bowers*'s generalization that the Constitution creates no affirmative duties is not strictly true.[1] In several situations involving government initiative or control the Supreme Court has recognized positive governmental duties arising from the Constitution: prison officials not only must refrain from actively imposing cruel and unusual punishments, but also must not be deliberately indifferent to prisoners' medical needs, *see Estelle v. Gamble,* 429 U.S. 97, 104–06, 97 S.Ct. 285, 291–92, 50 L.Ed. 251 (1976); the government is not altogether forbidden to take private property for public use, but must pay just compensation when it exercises that power; the government not only must permit criminal defendants to seek the assistance of counsel, but must provide counsel to certain indigent defendants, *see Johnson v. Zerbst,* 304 U.S. 458, 463, 58 S.Ct. 1018, 1022, 82 L.Ed. 1461 (1938); *see also Withers v. Levine,* 615 F.2d 158, 162 (4th Cir.) (duty to protect inmates from known risks of assault), *cert. denied,* 449 U.S. 849, 101 S.Ct. 136, 66 L.Ed.2d 59 (1980); *Davis v. Zahradnick,* 600 F.2d 458, 459 (4th Cir.1979) (same); *Spence v. Staras,* 507 F.2d 554, 557 (7th Cir.1974) (same); *Woodhous v. Virginia,* 487 F.2d 889, 890 (4th Cir.1973) (same). Indeed, *Bowers* itself recognized the limitations of its generalization, noting that the line between action and inaction is sometimes far from sharp. 686 F.2d at 618. "Inaction" when a murder is planned and committed in one's presence and perhaps with one's encouragement is far different from failure to anticipate and prevent the unplanned actions of a third party released from one's custody. *See Parratt v. Taylor,* 451 U.S. 527, 548, 101 S.Ct. 1908, 1919, 68 L.Ed.2d 420 (1981) (Powell, J., concurring in result) (footnote omitted) ("A 'deprivation' connotes an intentional act denying something to someone, or, at the very least, a deliberate decision not to act to prevent a loss."). Whether such conduct constitutes "action" so as to be the basis of a charge of "deprivation" depends on the relationship

---

1. Indeed, isolated exceptions may not be the generalization's greatest flaw. As it applies to the states, at least, the Constitution may create exactly the kind of affirmative duty *Bowers* and *Jackson* deny. In the debate over the privileges and immunities clause of the proposed fourteenth amendment members of Congress repeatedly cited with approval the 1823 circuit decision of Justice Washington in *Corfield v. Coryell,* 6 F.Cas. 546, 551 (C.C.E.D.Pa.1823), which described the privileges and immunities secured by article IV, section 2 of the Constitution as follows (emphasis added):

The inquiry is, what are the privileges and immunities of citizens in the several states? We feel no hesitation in confining these expressions to those privileges and immunities which are, in their nature, fundamental; which belong, of right, to the citizens of all free governments; and which have, at all times, been enjoyed by the citizens of the several states which compose this Union, from the time of their becoming free, independent, and sovereign. What these fundamental principles are, it would perhaps be more tedious than difficult to enumerate. They may, however, be all comprehended under the following general heads: *Protection by the government;* ....

*See* J. Ely, Democracy and Distrust 28–29 (1980); *but see id.* at 83.

of the parties involved, *see Fox v. Custis,* 712 F.2d at 88; it is clearest in straightforward custodial circumstances, when the fact of custody prevents one from fending for oneself, but may also be shown in other circumstances, as the right-to-appointed-counsel cases demonstrate. The relationship between O'Neal and Robinson may have been the type that would make "inaction"—at least when a life was known to be at stake—inexcusable.[2] The initiative by the FBI, a law enforcement agency, in encouraging O'Neal to accompany Robinson supports this characterization, despite Robinson's and Beard's ignorance of the FBI's role. Indeed, there is evidence in the record of an FBI policy that informants should

intervene to prevent violence, *see* Pl.App. 568 (testimony of FBI expert in *Beard v. Mitchell*), and the FBI was on notice both from O'Neal's own prior experience with Robinson[3] and from other cases, *see Bergman v. United States,* 565 F.Supp. 1353 (W.D.Mich.1983) (FBI undercover informant participated in beatings of "Freedom Riders" in Birmingham, Alabama, in 1961); *Liuzzo v. United States,* 565 F.Supp. 640 (E.D.Mich.1983) (FBI undercover informant accompanied Ku Klux Klansmen who shot and killed a civil rights demonstrator in Montgomery, Alabama, in 1965), that informants found themselves in such situations. To conclude that such a special relationship exists is not to impose a duty to be else-

**2.** Unlike *Bowers* and *Jackson,* O'Neal knew in advance that death was imminent, and accompanied and chauffeured the killer precisely for that reason. In *Bowers,* by contrast, the state officials merely released a man they did not know would kill; and in *Jackson* the state officials failed to realize that the burning car, away from which they directed other traffic, was occupied. In neither case did the defendants intend to allow death to occur. If the killer in *Bowers* had disclosed to the doctor-defendants a calculated design to kill the victim and yet was released and the victim not warned, or if the police-defendants in *Jackson* had peered in the windows watching the victims burning inside the car, those cases might have been different, for the defendants might then have been deemed more responsible for the loss of life.

It is perhaps worthwhile to make two observations here, one concerning the nature of the interest at stake—life—and one concerning the fact that this is a *Bivens* action. In *Parratt v. Taylor,* 451 U.S. at 543–44, 101 S.Ct. at 1916–17, the Supreme Court held that a state post-deprivation hearing satisfied the due process clause in a negligent-deprivation-of-property case because a pre-deprivation hearing was impossible given the nature of negligence cases and because the outcome—restoration of the property or its value—would put the plaintiff back in his rightful position. *Jackson v. City of Joliet,* 715 F.2d at 1205, a section 1983 case, noted that *Parratt* and certain other cases were not on point, but nevertheless cited them as creating a "mood" of deference to state tort remedies. When the constitutionally protected interest is life, rather than property as in *Parratt,* however, it is difficult to conclude that a post-deprivation hearing (*i.e.,* a wrongful death action) is all the process due, because we can be very sure that it cannot duplicate the outcome of a pre-deprivation hearing. Except in capital punishment cases the only possible con-

clusion is that deprivation is improper. After the fact, of course, whether the deprivation was the result of negligence or intentional action, neither a federal nor a state remedy can completely restore the loss; but no one contends that a state wrongful death action that compensates as adequately as section 1983 supplants the federal action for intentional deprivation of life, *see Jackson,* 715 F.2d at 1204, and I cannot conceive why negligent deprivations should be treated differently. I conclude that *Parratt's* "mood" is too ambiguous to provide guidance. In any case, this is a *Bivens* rather than section 1983 action, and the Supreme Court has explicitly held that the federal counterpart of the state wrongful death action, an action under the Federal Tort Claims Act, is not an adequate alternative to a *Bivens* remedy. *Carlson v. Green,* 446 U.S. 14, 19–23, 100 S.Ct. 1468, 1471–74, 64 L.Ed.2d 15 (1980).

**3.** O'Neal's involvement with Robinson, a late chapter in what the majority calls a "colorful" history, began in April 1972 when he was invited to join an armored car robbery. Robinson planned to finance the robbery with the proceeds of other robberies and murder contracts. In the first such episode, under Robinson's direction, O'Neal, armed with an ice pick, searched, slapped, handcuffed, and twice tied a plastic bag over the head of a man from whom Robinson sought information. Pl.App. 301–08. In another O'Neal fired a gun at a car believed to contain the object of one of Robinson's murder contracts, *id.* 354; in the course of the attempted performance of that contract at least one, *id.* 268, 420–22, and perhaps two, *id.* 267, 351, victims of mistaken identity were killed. In a third, O'Neal participated in the armed abduction of the object of another murder contract, who was released after he paid the abductors $400. *Id.* 381–96.

where, as the majority facetiously suggests; it merely imposes on those who assume a duty and put themselves in the way of exercising it the obligation to do so when the circumstances warrant, as similar state laws do. *See* W. Prosser, Handbook of the Law of Torts 341–42 (4th ed. 1971). Whether such a special relationship existed is partly a question of fact, *see Bowers v. DeVito,* 686 F.2d at 619–20 (Wood, J., dissenting), and we cannot assume that all relevant underlying facts have already been determined, because as the majority demonstrates collateral estoppel and res judicata have no application here. I therefore conclude that summary judgment is improper.

The second difficulty is related to the first. It would be impossible to label O'Neal's conduct "inaction," whether or not he had a duty to intervene, if his participation was actually active. The majority asserts that "the undisputed facts reveal that there is no causal link between O'Neal's acts (as distinguished from his inaction) and Jeff Beard's death." *Ante* at 898. I disagree. It has never been decided or conceded that Robinson's actions were the sole proximate cause of Beard's death, and the facts as alleged in the complaint could support a contrary conclusion. The plaintiff alleges that O'Neal "participat[ed] and assist[ed] in" Robinson's actions, Pl.App. 40, and evidence in the record elaborates his active involvement: Robinson, who began searching for Beard knowing only "that he goes by the name of 'Jeff' and had an unusually high natural" hairstyle, *id.* 402,

might not have located him but for O'Neal's insistence that he get more complete information, *id.* 403; O'Neal facilitated Robinson's "arrest" of Beard by driving the car and guarding Beard during two intervals when Robinson was absent, *id.* 447,[4] 418–19; when Robinson returned to the car after failing to kill Beard on the first try, O'Neal prompted him not to give up by telling him he "had really screwed up and that he was in big trouble," *id.* at 449.[5] The fact, if it is a fact, that Robinson would have committed the murder in a different fashion had O'Neal not assisted does not excuse any responsibility O'Neal bears for what actually occurred. Because it is disputed whether O'Neal's failures were entirely passive, summary judgment is inappropriate.

## II

I also disagree with the majority's conclusion that summary judgment in favor of FBI officers Gray, Grant, and Moore in their individual capacities was proper. Although supervisors cannot be held vicariously liable in *Bivens* actions under the theory of respondeat superior, *see Lojuk v. Quandt,* 706 F.2d 1456, 1468 (7th Cir.1983), they may be liable for constitutional deprivations for which they are personally responsible, *id; Crowder v. Lash,* 687 F.2d 996, 1005–06 (7th Cir.1982) (section 1983 claim). The majority "doubt[s] that the F.B.I. defendants, who never had any immediate contact with O'Neal, could be found personally responsible." *Ante* at 900. But im-

---

4. O'Neal testified in a deposition about the first of these incidents as follows:

> I pulled off the freeway into a Shell station that was closed in front of a phone booth. Robinson left the vehicle telling me to watch Beard, went to the phone booth, [and] made a short call . . . .
> Q. How long was Robinson out of the car to make the call, about?
> A. Three to five minutes.
> Q. What did you and Mr. Beard talk about in the interim?
> A. Well, it was small talk, but I don't really recall exactly what the substance of it was.
> Q. Did you tell Mr. Beard he was about to die?
> A. No, sir.

> Q. Did you think Mr. Beard was about to die at that point?
> A. Yes, sir.

5. O'Neal testified that when Robinson returned to the car after he had fired an ineffective shot and Beard had run away,

> Oh, I made a statement to the effect that Robinson had really screwed up and that he was in big trouble. And he turned to me and said to the effect that he wasn't and that he would find Beard. And he ran across the highway after telling me to wait in the car.
> Q. What prompted you to suggest that Robinson had screwed up and was in big trouble?
> A. I don't recall exactly what my frame of mind was, but it just wasn't—it seemed to be an appropriate statement at that time.

mediate contact with O'Neal is not indispensable, for we have noted that

> [w]ithout direct participation in the deprivation, an official can satisfy the personal responsibility requirement if "she acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent."

*Lojuk v. Quandt,* 706 F.2d at 1468 (quoting *Crowder v. Lash,* 687 F.2d at 1005). We also indicated in *Lojuk, supra,* that this standard might be satisfied if there was "a plan or pattern of incidents which should have put [the] defendant ... on notice" of the threat of deprivations of constitutional rights. In the present case the plaintiff alleges that such a pattern existed because of O'Neal's long history of participation in acts of violence, of which the FBI was aware, and that the FBI deliberately or recklessly failed to train, control, and supervise O'Neal in light of this history and the nature of the activities he was assigned to investigate. These issues present questions of fact that cannot be resolved on summary judgment.

It is arguable that L. Patrick Gray, then the Acting Director of the FBI, cannot be held personally responsible under this theory because of the breadth and generality of his oversight of FBI operations. In *Crowder v. Lash,* 687 F.2d at 1005–06, a section 1983 case challenging prison conditions, we upheld a directed verdict in favor of the state Commissioner of Corrections, because even though he had been informed of the conditions complained of, to impose liability there would justify holding any well informed commissioner personally liable in damages for any deprivations occurring at any prison within his jurisdiction, a result at odds with the personal responsibility requirement. I believe the posture of the present case makes it inappropriate to dismiss the claims against defendant Gray on this basis, however, because there has been no development of the necessary facts concerning his role in overseeing the Chicago FBI operations, either at trial or by affidavits accompanying motions for dismissal or summary judgment (for summary judgment was urged below on quite a different theory).

Apart from the question of the existence of a cause of action against Gray, Grant, and Moore, there is an additional question whether they are immune from liability for damages. The briefs contain extensive arguments about the appropriate standards of liability and immunity, the plaintiff arguing that negligence is a sufficient basis for liability after *Parratt v. Taylor,* 451 U.S. at 534–35, 101 S.Ct. at 1912; the defendants replying that after *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), they are immune unless the constitutional right was clearly established at the time of the deprivation; the plaintiff rejoining that the constitutional right not to be deprived of life was well established; and the defendants retorting that whether negligent deprivations were actionable was not clearly established. These knotty questions need not be resolved now, however, because it is clear from the discussion above that to satisfy the personal responsibility requirement for liability in their supervisory roles the defendants must have acted recklessly or deliberately, and the right not to be recklessly or deliberately deprived of life was well established in 1972. Whether the requisite degree of recklessness existed remains a disputed fact.

### III

I agree with the majority that sovereign immunity bars holding the FBI officials in their official capacities and the FBI itself liable. The United States and its agencies are generally immune from damage liability unless their immunity is expressly waived. *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980); *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 704–05, 69 S.Ct. 1457, 1468–69, 93 L.Ed. 1628 (1949). If this were a claim under the Federal Tort Claims Act, waiver of this privilege would be clear; but because it is not such an action and is not

premised on any other waiver provision I conclude that the FBI is immune. The plaintiff argues that it would make sense to impose liability for constitutional deprivations on the government because the loss could be spread among society as a whole without chilling the exercise of officials' decisionmaking powers. *Owen v. City of Independence,* 445 U.S. 622, 635–56, 100 S.Ct. 1398, 1407–18, 63 L.Ed.2d 673 (1980), relied partly on such arguments in holding that municipalities were not immune from damage suits under section 1983. *Owen* emphasized, however, that any "tradition of immunity . . . firmly rooted in the common law" was not overridden by section 1983, *id.* at 637, 100 S.Ct. at 1408, and painstakingly demonstrated that "there is no tradition of immunity for municipal corporations," *id.* at 638, 100 S.Ct. at 1409; *see id.* at 638–50, 100 S.Ct. at 1409–15. The Supreme Court has not interpreted section 1983 as overriding the more firmly rooted immunity enjoyed by the states, *see Quern v. Jordan,* 440 U.S. 332, 338–45, 99 S.Ct. 1139, 1143–47, 59 L.Ed.2d 358 (1979), despite Congress's power under section 5 of the fourteenth amendment to do so, *see Fitzpatrick v. Bitzer,* 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976). Because the United States' sovereign immunity is also well established, and indeed was strongly summarized in *United States v. Mitchell, supra,* decided the day before *Owen;* and because the Supreme Court has treated immunities from damages under section 1983 and *Bivens* similarly, *see Butz v. Economou,* 438 U.S. 478, 500–04, 98 S.Ct. 2894, 2907–09, 57 L.Ed.2d 895 (1978), I conclude that the United States and its agencies are immune from damage liability in *Bivens* actions.

Defendants Gray, Grant, and Moore are immune from damage liability in their official capacities for the same reason. We recently noted that state officials enjoy such immunity because damage awards assessed against officials in their official capacity would be satisfied with state funds, an impermissible result given the states' own immunity. *Owen v. Lash,* 682 F.2d 648, 654–55 (7th Cir.1982). The same reasoning applies to federal officials sued in their official capacity. *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. at 686–88, 69 S.Ct. at 1459–60. I hasten to note that this reasoning has been held not to bar damage suits against officials in their individual capacities, *id.* at 686–90, 69 S.Ct. at 1459–61, and does not bar injunctive or mandamus relief when an official acts unconstitutionally or beyond his power, *id.* at 690–91, 69 S.Ct. at 1461–62. *See also* 5 U.S.C. § 702 (1982) (waiving immunity for claims seeking relief other than money damages against federal officials and agencies).

I disagree, however, with the majority's intimation that the official-capacity claims are barred by res judicata principles because Gray, Grant, and Moore are in privity with Mitchell, who was exonerated in *Beard v. Mitchell.* Ante at 897. This argument has force only to the extent that Mitchell and the current defendants were charged with official liability for the same wrong. But the individual misdeeds with which Gray, Grant, and Moore are charged are separate from the charges against Mitchell, and could not have been litigated in the earlier trial because Mitchell could not have been charged with liability for the misdeeds of his superiors. If the issue of Mitchell's culpability played a part in the later trial of the other FBI officials, relitigation of that issue might be barred, but the plaintiff certainly could still litigate the later defendants' own culpability. In any event, these arguments are unnecessary because sovereign immunity bars official-capacity damage claims.

## IV

I dissent from the court's holding that summary judgment was properly entered in favor of O'Neal, because it is factually disputed both whether a special relationship existed between O'Neal and Beard, creating a duty to act, and whether O'Neal merely failed to be a good Samaritan or in fact played a more active role. I also dissent from the court's holding that summary judgment was properly entered in favor of FBI officials Gray, Grant, and Moore in

their individual capacities. Officials may be liable for supervisory acts or failures to act provided they were sufficiently reckless or deliberate to be assigned personal responsibility. Such recklessness has been alleged, and remains a disputed issue of fact. I concur in the holding that the FBI and its officers in their official capacities are immune from liability for damages under traditional sovereign immunity principles.