779 F.2d 52
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
RALPH E. NISHIYAMA AND WIFE, GABRIELENE NISHIYAMA, as
surviving parents and next-of-kin of KATHY JANE
NISHIYAMA, Plaintiffs-Appellants,
v.
DICKSON COUNTY, TENNESSEE, a political subdivision of the
State of Tennessee, DOWELL (DOYLE) WALL and
CARROLL FISER, Defendants-Appellees.
 83-5683
 United States Court of Appeals, Sixth Circuit.
 10/30/85
 
 REVERSED AND REMANDED
 M.D.Tenn., 573 F.Supp. 200
 ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE
 BEFORE: JONES and CONTIE, Circuit Judges; and GILMORE, District Judge.*
 JONES, Circuit Judge.
 
 
 1
 This matter is before us on plaintiffs' motion for reconsideration of our previous unpublished opinion. Plaintiffs Ralph and Gabrilene Nishiyama brought this action under 42 U.S.C. Sec. 1983 against two members of the Dickson County, Tennessee Sheriff's Department and Dickson County. The Nishiyamas' complaint alleged that the defendants' policy of entrusting fully-equipped official patrol cars to inmate Charles Edward Hartman deprived their daughter of her life without due process of law when Hartman allegedly used a patrol car first to stop and then to murder Kathy Nishiyama. The district court dismissed the Nishiyamas' complaint for failure to state a claim. The district court held that the sheriffs' conduct had not deprived Kathy Nishiyama of a constitutionally-protected right. The district court alternatively held that Kathy Nishiyama was not denied due process of law because Tennessee's wrongful death action would satisfy the due process requirements established in Parratt v. Taylor, 451 U.S. 527 (1981).
 
 
 2
 We reverse both holdings. First, the defendants' conduct in maintaining their policy and custom deprived Kathy Nishiyama of her constitutionally-protected interest in life. Second, Logan v. Zimmerman Brush Co., 455 U.S. 422 (1982), governs the deprivation in this case, which was accomplished as a result of established policy rather than as a result of a random and unauthorized act of the sort with which Parratt is concerned. Therefore, the availability of a wrongful death action in state court does not satisfy the requirements of due process in the present case.
 
 I.
 
 3
 The Nishiyamas' complaint alleges the following facts, which we must accept as true when determining whether dismissal for failure to state a claim was proper. See Windsor v. The Tennessean, 719 F.2d 155, 158 (6th Cir. 1983), cert. denied, 105 S. Ct. 105 (1984). Shortly after 8:30 p.m. on November 16, 1981, Kathy Jane Nishiyama was driving on Lafayette Road in Montgomery County, Tennessee, several blocks from home. She responded to the signals of a Dickson County Sheriff's Department patrol car that directed her to pull over to the side of the road. When she did so, Charles Edward Hartman, the patrol car's sole occupant, approached Kathy Nishiyama and beat her to death.
 
 
 4
 Hartman was not an employee of the Dickson County Sheriff's Department. He was a convicted felon and an inmate in the custody of the Dickson County Sheriff's Department. He was operating the patrol car with the permission and authorization of defendants Sheriff Doyle Wall and Deputy Sheriff Carroll Fiser. These defendants had placed Hartman on 'Trusty' status following his transfer from the custody of the State of Tennessee to the Dickson County Jail under the provisions of T.C.A. Secs. 41-8-101, et seq.
 
 
 5
 Wall and Fiser had a policy and practice of several months standing, which allowed Hartman to have completely unsupervised use of Dickson County patrol cars equipped with standard blue flashing lights and official identifying markings. Under their policy, Wall and Fiser allowed Hartman to have unsupervised use of Dickson County patrol cars to conduct official tasks for them, to perform personal tasks for their private benefit, and to perform personal tasks for Hartman's own benefit. A Dickson County Grand Jury eventually investigated this policy and recommended that it cease. The Nishiyamas also allege that the defendants were on notice that Hartman, a convicted burgler, was dangerous and had assaulted a young woman in the past.
 
 
 6
 On the night of the murder, Deputy Fiser instructed Hartman to drive him home from the Dickson County Jail to his farm. Upon arriving at his farm, Fiser placed the fully-equipped and plainly-marked patrol car in Hartman's unsupervised possession. After leaving Fiser's farm, Hartman prowled the highways of Dickson, Houston, and Montgomery Counties. He stopped several motorists by flashing the patrol car's blue lights. Montgomery County officials learned that a Dickson County Sheriff's car was stopping motorists in their county. They notified the Dickson County dispatcher, who in turn notified Wall and Fiser. Wall and Fiser did nothing. Ten hours after he had left the jail, Hartman returned. The Nishiyamas contend that during the interim he used the patrol car to pull over their daughter's car and that he then murdered her. They contend that Wall and Fiser's policy of allowing Hartman unsupervised use of an official patrol car proximately caused their daughter's death.
 
 II.
 
 7
 Application of the following test determines whether the Nishiyama's stated a claim under Sec. 1983:
 
 
 8
 (1) Did the plaintiffs' complain of conduct undertaken 'under color of state law'?
 
 
 9
 (2) Did the conduct allegedly cause the deprivation of constitutional rights?
 
 
 10
 (3) Did the deprivation occur 'without due process of law'?
 
 
 11
 See Screws v. United States, 325 U.S. 91 (1945). We agree with the district court's conclusion that the defendants' policy of providing Hartman with a marked and fully-equipped patrol car was established under color of state law. The second and third elements of the test govern this appeal: whether the defendants deprived Kathy Nishiyama of a right secured by the Constitution; and whether any deprivation occurred without due process.
 
 
 12
 Kathy Nishiyama's interest in preserving her life is one of constitutional dimension. The Fourteenth Amendment does not guarantee life, however, it guarantees that the state cannot deprive an individual of life without due process. Our first inquiry is whether the state deprived Kathy Nishiyama of her life by the conduct of its agents. This issue can be viewed either as a matter of identifying the constitutional duty that the state actors breached or as a matter of proximate cause. See, e.g., Martinez v. California, 444 U.S. 277, 285 (1980).
 
 
 13
 Prior cases involving alleged liability of state defendants for a violent act committed by a third party who was not acting under color of state law have exclusively considered the question of whether state actors have had a duty to protect a member of the public from acts of violence. See Martinez v. California, 444 U.S. 277 (1980); Beard v. O'Neal, 728 F.2d 894 (7th Cir.), cert. denied, 105 S. Ct. 104 (1984); Wright v. City of Ozark, 715 F.2d 1513 (11th Cir. 1983); Fox v. Custis, 712 F.2d 84 (4th Cir. 1983); and Bowers v. DeVito, 686 F.2d 616 (7th Cir. 1982). Thus far, courts have uniformly refused to recognize a duty on the part of the state to protect individual members of the public from random acts of violence. See Bowers, 686 F.2d at 618 ('[T]here is no constitutional right to be protected by the state against being murdered by criminals or madmen.')
 
 
 14
 The Nishiyamas, however, do not claim that the defendants violated a duty to protect Kathy Nishiyama. Instead, they claim that the defendants breached their duty not to use their office to affirmatively aid an inmate in their custody in the execution of a crime. Keeping in mind this distinction between affirmative aid to an inmate and failure to protect against violence by a member of the public, we turn to Martinez for guidance on the limits of liability under section 1983 for a murder committed by someone other than a state official.
 
 
 15
 In Martinez, the plaintiffs sought to hold California parole officials liable under section 1983 for their decision to release a parolee. Five months after his release, the parolee murdered plaintiffs' daughter. In concluding that plaintiffs had failed to state a claim under section 1983, the Supreme Court emphasized three considerations that are relevant to determinations of proximate cause under traditional tort 'duty' analysis. One consideration was the relationship between the criminal and the state defendants. The Supreme Court observed that the parolee in Martinez 'was in no sense an agent of the parole board.' 444 U.S. at 285. See also Beard v. O'Neal, 728 F.2d at 898 (officer may be personally liable for acts of person who operated the murder weapon when symbolic support of the government is provided by the officer's presence and authority). A second consideration in Martinez was the relationship between the criminal acts of the third party and the defendant officers' acts under color of state law. '[D]ecedent's death is too remote a consequence of the parole officers' action to hold them responsible under the federal civil rights law.' Martinez, 444 U.S. at 285. A third consideration in Martinez was the relationship between the victim of the criminal act and the state officers. The Supreme Court observed that 'the parole board was not aware that appellants' decendent, as distinguished from the public at large, faced any special danger.' Martinez, 444 U.S. at 285. See also Beard v. O'Neal, 728 F.2d at 900 (The victim 'was a 'member[] of the general public, living in a free society, and having no special custodial or other relationship with' the F.B.I.') (quoting Fox v. Custis, 712 F.2d 84, 88 (4th Cir. 1983)). Analysis of the concerns expressed in Martinez and the other Circuit Court cases addressing alleged failure to protect against the acts of private third parties demonstrates the distinctions between those cases and the Nishiyamas' claims.
 
 
 16
 We first consider the relationship between Hartman and the defendants. Unlike the criminals in Martinez and the other leading cases, Hartman was not a member of the general public. Throughout the period relevant to this case, Hartman remained in the custody of the Dickson County Sheriff's Department. There is no indication that Hartman even attempted to flee this custody. During Hartman's ten-hour journey from Fiser's farm to the Dickson County Jail, the defendants never reported or otherwise treated him as an escapee. By policy Wall and Fiser authorized Hartman to use and have sole control over the patrol car. The defendants had a policy of allowing Hartman to use the patrol car for his own private purposes. Never, during the period when Kathy Nishiyama was murdered, did Dickson County release Hartman nor did he escape.
 
 
 17
 No similar custodial relationship existed between the criminal and the state officers in the failure to protect cases. In Martinez, the murderer was a parolee who was not in custody, controlled, supervised, or otherwise connected with the state parole board at the time of the crime. Martinez, 444 U.S. at 280 n.2. In Bowers, the murderer had been released from custody by the Illinois Department of Mental Health nearly a year before committing the murder in question. Bowers, 686 F.2d at 617. In Fox, the criminal was a parolee living among the general public at the time he committed the crime; the defendant parole officers allegedly erred by failing to reestablish a custodial relationship. Fox v. Custis, 712 F.2d at 86. In Beard the criminal was never in the state's custody before committing the murder in question; the defendant was an undercover informant who did not risk his own life to prevent a murder committed in his presence. Beard v. O'Neal, 728 F.2d at 895-96. In Wright, the rapist had absolutely no relationship with the defendant city officials, who allegedly suppressed information concerning prior rapes in the City of Ozark. Wright v. City of Ozark, 715 F.2d at 1516. The custodial relationship between Hartman and the Dickson County Sheriffs supports a finding that Wall and Fiser had the power and authority to direct Hartman's actions in a way that was absent from the other cases.
 
 
 18
 We next consider the relationship between the defendants' acts under color of state law and Hartman's crime. Here, Wall and Fiser's actions placed in motion the specific forces that enabled Hartman to commit his crime. See Jackson v. Byrne, 738 F.2d 1443, 1446 (7th Cir. 1984) ('Our analysis would no doubt be different if government officials set the fire or placed forces in motion which ignited the fire that claimed the lives of the Jackson children.'). The defendants provided Hartman with the necessary means to commit his crime when they entrusted to his use a powerful symbol of governmental authority. In the present procedural stance of this case, we must conclude that Hartman was able to direct Kathy Nishiyama to stop by the side of the road several blocks from her home only by wielding the authority that the fully-equipped patrol car represented. Conversely, Kathy Nishiyama became Hartman's victim only because she obeyed the instructions Hartman conveyed to her by means of the patrol car's apparent authority to control traffic.
 
 
 19
 Wall and Fiser's conduct in allowing Hartman to roam the countryside without supervision also provided him with the opportunity to commit this crime. The sheriffs had a policy of allowing Hartman to use patrol cars for his own private purposes. Hartman's ten-hour journey from Fiser's farm to the Dickson County Jail was not sufficiently unusual to cause the sheriffs to investigate. Wall and Fiser apparently saw no need to respond to the report which should have alerted them that Hartman was using his Dickson County patrol car to stop vehicles traveling the roads of Montgomery County. Neither on that night nor on any other occasion did they do anything to stop or disavow Hartman's use of the patrol car for his private purposes. The defendants' original act created the opportunity for Hartman to murder Kathy Nishiyama and their subsequent omissions extended that opportunity. The defendants actively facilitated Hartman's crime.
 
 
 20
 None of the prior cases we have reviewed contain a similarly close relationship between the criminal acts and the defendants' acts under color of state law. In Martinez, where the Supreme Court observed that 'decedent's death is too remote a consequence of the parole officers' action,' 444 U.S. at 285, the only action of the state officers was their decision to release from custody the person who subsequently committed murder. The state officers provided neither the specific means nor the specific opportunity for the crime. Similarly, in Bowers and Fox the only official actions that allegedly caused the murders were the decision to release the criminal and the decision not to revoke the parole of the criminal. The acts of the state officials in Wright provided neither the means nor the specific opportunity for the criminal to act.
 
 
 21
 Although Beard appears to be more troublesome because the informant's inaction allowed the murder to occur, several factors distinguish the present case from Beard. Most significantly, the murder would have occurred without the informant's assistance; he did not set in motion the criminal acts. Second, nothing the informant did facilitated or affirmatively aided the murder. Third, the informant's presence in no way provided the symbolic support of the government empowering the murderer to act. See Beard, 728 F.2d at 898. Fourth, the informant's presence provided the murder victim with a chance for life that otherwise he would not have had; in fact, the informant attempted to telephone his F.B.I. contact to inform him and thereby prevent the murder. Id. 728 F.2d at 896.
 
 
 22
 The issues of the present case resemble those of the prior authorities from other circuits insofar as the state officers have in each instance possessed information beforehand that circumstances endangering the public existed; Wall and Fiser should have known that Hartman had previously assaulted a young woman. Yet, in no prior case that we have discovered did the state officers possess such information and by their acts under color of state law facilitate the criminal acts by providing the criminal with the necessary means and the specific opportunity to commit his crime.
 
 
 23
 Our third consideration is the relationship between Kathy Nishiyama and the defendants. In finding no liability the courts in the failure to protect cases have emphasized the absence of a special relationship between the state actors and the victims.[1] See Martinez, 444 U.S. at 285. See also Beard, 728 F.2d at 900; Fox, 712 F.2d at 88. The present case, however, does not involve a failure by Wall and Fiser to protect Kathy Nishiyama. The defendants, by their acts under color of state law, affirmatively facilitated Hartman's crime by arming him with a symbol of governmental authority necessary to the commission of the crime and by providing him with his only opportunity to commit the crime. Under these circumstances the limited relationship between the victim and the state actors is not controlling. We hold that, viewing the alleged conduct of Wall and Fiser as proven, the defendants' conduct under color of state law deprived Kathy Nishiyama of a constitutionally-protected interest in life.
 
 III.
 
 24
 We next determine that this deprivation occurred without due process of law. The Nishiyamas allege that Wall and Fiser, as duly authorized representatives of Dickson County, established a policy of entrusting Hartman with unsupervised use of fully-equipped, marked patrol cars. This policy was allegedly of several months standing at the time of Kathy Nishiyama's murder. On the night of the murder, Fiser entrusted a patrol car to Hartman and sent Hartman off on the public highways without supervision. This is the relevant act under color of state law. Fiser not only acted in his capacity as a Dickson County Deputy Sheriff, he also acted in accordance with the policy of authorizing Hartman to use patrol cars without supervision that Sheriff Wall and Deputy Fiser allegedly had established.
 
 
 25
 The district court determined that, if Kathy Nishiyama was deprived of a constitutionally-protected right, Parratt v. Taylor, 451 U.S. 527 (1981), governed the Nishiyamas' claim. Parratt involved a deprivation of property 'as a result of a random and unauthorized act by a state employee.' Id. at 541. Parratt held that under such circumstances, no due process violation occurred if the state provides an adequate postdeprivation remedy. Id. In Vicory v. Walton, 721 F.2d 1062 (6th Cir. 1983), cert. denied, 105 S. Ct. 125 (1984), this Court held that a section 1983 plaintiff who claims a deprivation of property without due process must 'plead and prove that state remedies for redressing the wrong are inadequate.' 721 F.2d at 1066. In Hudson v. Palmer, 104 S. Ct. 3194 (1984), the Supreme Court extended the rule of Parratt to govern random and unauthorized intentional conduct by state officers that deprived a person of property. This Court recently extended Parratt to govern random and unauthorized negligent deprivations of liberty. Wilson v. Beebe, Nos. 82-1362/1385 (6th Cir. August 12, 1985) (en banc).
 
 
 26
 The district court found that the Nishiyamas had failed to state a claim on which relief would be granted under Parratt for the following reasons: first, the conduct of Hartman was random and unauthorized; second, Parratt governed such deprivations of life; third, Tennessee's wrongful death action represented an adequate postdeprivation remedy for the murder of Kathy Nishiyama.
 
 
 27
 We have serious doubts that Parratt governs deprivations of life without due process of law, although that question remains open. In Parratt, the Supreme Court acknowledged that the requirements of due process must be satisfied 'at some time before a State finally deprives a person' of her constitutionally-protected interest. Parratt, 451 U.S. at 540 (emphasis added). It is difficult to imagine a constitutional deprivation more final than death when a person's interest in living is at stake.
 
 
 28
 We need not, and therefore do not, reach the question of whether Parratt governs deprivations of life because the district court erroneously began its analysis of Parratt. The district court found that Parratt applied because Hartman's conduct was random and unauthorized. Hartman's actions, however, were not the conduct under color of state law on which the Nishiyamas based their suit. Hartman is not a defendant in the Nishiyamas' section 1983 action. The Nishiyamas' theory of liability is based upon the conduct of Wall and Fiser in authorizing inmate Hartman to use an official patrol car without supervision. Wall and Fiser's conduct is alleged to be neither random nor unauthorized but in accordance wth established procedure. Plaintiffs allege that this policy should never have been established. Therefore, Parratt does not govern the present case.
 
 
 29
 Instead, Logan v. Zimmerman Brush Company, 455 U.S. 422 (1982), establishes the applicable rule when an established policy allegedly results in the deprivation of a constitutionally-protected interest. Under Logan, the postdeprivation state remedy does not prevent a due process violation from occurring because it is the procedure itself that is challenged in the context of conduct allegedly in accordance with that procedure. The Supreme Court has recognized that Logan rather than Parratt applies when a deprivation is 'caused by conduct pursuant to established state procedure, rather than random and unauthorized action.' Hudson, 104 S. Ct. at 3203. This Court has applied the distinction to recognize that when liability is based upon authorized, official conduct, it is the underlying policy that is at issue. Spruytte v. Walters, 753 F.2d 498, 511-12 (6th Cir. 1985).
 
 
 30
 In the present case, Hartman's conduct is relevant to the question of whether Wall and Fiser's actions resulted in the constitutional deprivation. We have answered that question in Section II above. There can be no doubt that the Nishiyamas have alleged that Wall and Fiser established a policy on behalf of Dickson County of authorizing Hartman to use official patrol cars without supervision, and that the ?? acted in accordance with that policy on the evening of Kathy Nishiyama's murder. These allegations establish a claim for deprivation of life without due process, although they are subject to proof or disproof at trial.
 
 IV.
 
 31
 For the foregoing reasons, we conclude that, viewing the facts alleged as true, the Nishiyamas have stated a claim under section 1983 both that the defendants' conduct under color of state law deprived Kathy Nishiyama of her constitutionally-protected interest in life and that the defendants' actions deprived her of that right without due process of law. Therefore, we REVERSE the district court and REMAND for further proceedings.
 
 
 
 *
 The Honorable Horace W. Gilmore, District Judge, United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 We do not construe these cases to require, even under the failure to protect theory, a relationship in which the state defendants personally know before the crime is committed both who the victim will be and when and how the crime will be committed. In the present case, the Nishiyamas have alleged a relationship between their daughter and the defendants. Wall and Fiser should have known that Hartman had a documented propensity toward violence and that he had previously attacked a young woman. Upon learning that a Dickson County patrol car was stopping motorists in Montgomery County, a reasonable person would have known that this was Hartman. Thus, Wall and Fiser should have known that Hartman posed an immediate danger of violence to young women traveling the roads of Montgomery County